# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | |
|---|---|
| WAYNARD WINBUSH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 3:20-CV-489-DCLC-HBG |
| | ) |
| BERT BOYD, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Now before the Court is a prisoner's pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 in which Petitioner challenges several drug-related convictions [Doc. 1]. Petitioner has also filed many motions, including a motion to amend his petition [Doc. 6], which is **GRANTED** to the extent that the Court will consider the arguments therein below. However, after reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to habeas corpus relief under § 2254. Accordingly, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the petition for a writ of habeas corpus will be **DENIED**, this action will be **DISMISSED**, and the remaining motions [Docs. 7, 8, 14, 18, 29, 30, 32] will be **DENIED as moot**.

## I.    BACKGROUND

In its opinion addressing Petitioner's convictions on direct appeal, the Tennessee Criminal Court of Appeals ("TCCA") summarized the underlying state court criminal proceedings against Petitioner as follows:

> The Knox County Grand Jury charged [Petitioner], along with multiple co-defendants, via presentment, with the following offenses:

| | Offense Charged |
|---|---|
| | |

| | |
|---|---|
| 1 | Conspiracy to possess with the intent to sell 150 grams or more of a Schedule I controlled substance (heroin) in a drug-free zone |
| 2 | Conspiracy to possess with the intent to deliver 150 grams or more of a Schedule I controlled substance (heroin) in a drug-free zone |
| 3 | Conspiracy to sell 150 grams or more of a Schedule I controlled substance (heroin) in a drug-free zone |
| 4 | Conspiracy to deliver 150 grams or more of a Schedule I controlled substance (heroin) in a drug-free zone |
| 5 | Conspiracy to possess with the intent to sell a Schedule II controlled substance (oxycodone) in a drug-free zone |
| 6 | Conspiracy to possess with the intent to deliver a Schedule II controlled substance (oxycodone) in a drug-free zone |
| 7 | Conspiracy to possess with the intent to sell a Schedule II controlled substance (oxymorphone) in a drug-free zone |
| 8 | Conspiracy to possess with the intent to deliver a Schedule II controlled substance (oxymorphone) in a drug-free zone |
| 15 | Failure to appear for arraignment for offense of driving without a valid license |
| 16 | Possession with the intent to sell less than 15 grams of a Schedule I controlled substance (heroin) in a drug-free zone |
| 17 | Possession with the intent to deliver less than 15 grams of a Schedule I controlled substance (heroin) in a drug-free zone |
| 18 | Possession with intent to sell less than 200 grams of a Schedule II controlled substance (oxycodone) in a drug-free zone |

2

| 19 | Possession with intent to deliver less than 200 grams of a Schedule II controlled substance (oxycodone) in a drug-free zone |
|----|----------------------------------------------------------------------------------------------------------------------------|
| 20 | Possession with intent to sell less than 200 grams of a Schedule II controlled substance (oxymorphone) in a drug-free zone |
| 21 | Possession with intent to deliver less than 200 grams of a Schedule II controlled substance (oxymorphone) in a drug-free zone |
| 23 | Destruction of evidence |
| 25 | Failure to appear for arraignment for offense of driving without a valid license |
| 26 | Failure to appear for arraignment for offense of criminal impersonation |

Counts 9 through 14, 22, and 24 of the presentment did not include charges against [Petitioner]. Counts 5 and 6 were dismissed prior to trial.

*Trial*

The case proceeded to trial and a jury found [Petitioner] guilty of Counts 1-4, 7-8, 18-19, and 20-21. The jury acquitted [Petitioner] on Counts 15-17, 23, and 25-26. Counts 2-4 and 7-8 were merged into Count 1. Count 19 was merged with Count 18, and Count 21 was merged with Count 20. The trial court sentenced [Petitioner] to 20 years' incarceration for each conviction in Counts 1-4 and 7-8, and 3 years for each conviction in Counts 18-19 and 20-21. The sentences in Counts 1-4 and 7-8 were run concurrently with each other. Additionally, the sentences in Counts 18 and 20 were run concurrently with each other, but consecutively to Count 1, for an effective sentence of 23 years.

The trial testimony established [that] Knoxville Police Department (KPD) Investigator Philip Jinks, recognized as an expert in the fields of drug and conspiracy investigations, learned about the drug operation that transported heroin from Detroit to Knoxville in this case in late 2012 or early 2013. The heroin involved in the investigation was a "brown-rocky-type substance," or black tar that looks like "a black[,] gummy substance." The heroin was not a type he had seen before. Being an experienced investigator, Investigator Jinks knew that people

3

involved in the drug trade tried to hide who they were by renting vehicles and houses in other people's names, and paying people in cash or drugs. The dealers used multiple cell phones, called "burner phones," and did not use them for long periods of time. The dealers did "everything they [could] to avoid law enforcement contact and us[e] their real information." Dealers often used code when talking or texting each other. Oxycodone pills were known as "roxies," "blues," or "Rs." Oxymorphone pills were known as "opanas" or "moons." Dealers did not typically carry drug paraphernalia, needles, or filters with them, as they were not users.

Ohio State Highway Patrol Officer Jason Archer conducted a stop on January 3, 2013, of a vehicle containing Christopher Holloway, August Allen, and Nicole Ferris. During the stop, Officer Archer found a marijuana cigarette, 4.68 grams of heroin, and .52 grams of cocaine. He also found a bottle of white powder that was later identified as a cutting agent. Eventually, Investigator Jinks learned that the people in this vehicle were involved in drug transactions in the Knoxville area.

KPD Officer Joey Whitehead stopped a car on March 6, 2013 in Knoxville because the driver was not wearing a seatbelt. After the car stopped, the unidentified driver ran into a nearby apartment at Christenberry Heights on Dutch Valley Road in Knoxville. Richard McFadden was a passenger in the vehicle. Officer Whitehead knocked on the door of the apartment, and Amanda Maples answered. Ms. Maples consented to a search of the apartment. Officer Whitehead observed a yellow folder in the apartment. The folder contained paperwork from Ohio regarding Mr. Holloway's arrest for drug trafficking. Officer Whitehead knew that Investigator Jinks had an ongoing drug investigation and reported the information to Investigator Jinks.

On March 25, 2013, Knox County Sheriff's Officer James Trout stopped Mr. McFadden at the Greyhound bus station. Mr. McFadden had marijuana, $9100 cash, and a set of digital scales on his person. Mr. McFadden was going to Detroit. Mr. McFadden indicated the money was from marijuana sales. Mr. McFadden consented to a search of his cell phone. Text messages consistent with the sale of heroin were found on the phone. In one text message, Mr. McFadden directed someone to the Adair Manor Apartments, and told them to "[c]all D." Ms. Maples confirmed that the $9100 belonged to [Petitioner].

During his investigation, Investigator Jinks heard the nicknames "Ooh" and "Nunu." At some point he learned that "Ooh" was Mr. Allen and that "Nunu" was Mr. McFadden. Eventually Investigator Jinks identified Coleman Strickland, Tim Ford, Nicole Farris, Joseph Green, Megan Huffaker, and [Petitioner] as those involved in the drug conspiracy. The locations in Knoxville being used by [Petitioner] and co-conspirators for dealing the drugs were 1313 New York Avenue, Adair Manor Apartments, an apartment on Dutch Valley Road, locations on Merchants Drive and Cedar Bluff Road, and 173 Chickamauga Avenue. Ms. Maples rented the house at 1313 New York Avenue. [Petitioner] paid rent for the

residence and provided Ms. Maples with heroin in exchange for placing the 1313 New York Avenue residence in her name.

Investigator Jinks employed Nicole Bryant as a confidential informant during his investigation. He paid Ms. Bryant $40 cash for each controlled buy. Each controlled phone call between Ms. Bryant, Mr. Allen, Mr. Green, and [Petitioner] was recorded. Each controlled buy was monitored live and video recorded by police. The funds used to purchase the drugs were photocopied or photographed prior to each transaction, so the dollars could be identified by serial number if they were found during the course of the investigation.

On June 13, 2013, Ms. Bryant participated in a controlled buy from Mr. Allen. The buy was set up during a phone call to XXX-XXX-9692. Ms. Bryant went to the Adair Manor Apartments to complete the purchase. Investigator Jinks observed Mr. Allen and Mr. Green enter the apartment building. Ms. Bryant completed the purchase of .16 grams of heroin described as a "bluish-grey, rocky substance." []

On June 20, 2013, Investigator Jinks and Ms. Bryant conducted another controlled buy. Ms. Bryant met Mr. Allen at 1313 New York Avenue. When Ms. Bryant arrived, Mr. Allen was outside the residence. Testing confirmed that the drugs purchased by Ms. Bryant were .14 grams of "bluish-grey" heroin. After the buy, police officers followed Mr. Allen in a Chevrolet Trailblazer driven by Ms. Huffaker to a Christenberry Heights apartment, just off Dutch Valley Road.

On June 21, 2013, Investigator Jinks returned to the apartment at Christenberry Heights and observed Ms. Huffaker and Mr. Allen leave in the Trailblazer. He later observed Mr. Green [] in the Trailblazer. They stopped at a McDonald's where Investigator Jinks saw an unknown female get in the back of the vehicle and exit a short time later. Investigator Jinks requested that a marked patrol car conduct a stop of the vehicle, with a goal of identifying Mr. Allen, whom Investigator Jinks only knew as "Ooh" at that point. The vehicle was stopped. Mr. Allen was taken in to custody on an outstanding warrant from Ohio. At the time of the stop, Ms. Huffaker possessed $2500 in cash, and Mr. Green possessed $1500 in cash. Three of the $20 bills used in the June 20, 2013 controlled buy were among the cash found in Mr. Green's pocket.

Ms. Bryant informed Investigator Jinks that she attempted to contact Mr. Allen again on June 24, 2013 and that Mr. Allen's phone was answered by someone named "D." Investigator Jinks and Ms. Bryant made a controlled phone call to Mr. Green to talk about members of the conspiracy and when she could obtain drugs. On June 30, 2013, [Petitioner] contacted Ms. Bryant and asked that she come pick him up at the Tanglewood Apartments. [Petitioner] and Mr. Green were both present when she arrived, and she drove both of them to several places including a house off of Kim Watt Road. [Petitioner] wanted Ms. Bryant to rent the house in her name, indicated that he would deposit $2500 in to Ms. Bryant's bank account to pay for it, and told her that he would pay the rent on the house. Ms. Bryant

5

obtained the rental application from the owner. Ms. Bryant informed Investigator Jinks about [Petitioner]'s plans to rent the house.

Investigator Jinks learned that Ms. Maples had an outstanding arrest warrant and that she was staying at the Adair Manor Apartments. On June 28, 2013, Investigator Jinks went to the Adair Manor Apartments to serve the warrant on Ms. Maples and observed [Petitioner] driving a rental vehicle with Mr. Green as the passenger. Ms. Maples came out of the apartment and interacted with Mr. Green. Investigator Jinks approached with KPD Officer Adam Broome. Investigator Jinks attempted to arrest Ms. Maples and deal with Mr. Green, while Officer Broome spoke with [Petitioner]. Investigator Jinks saw [Petitioner] put his hands down by the side of his seat, and Investigator Jinks heard something hit the vehicle floorboard. Thinking it might be a weapon, Investigator Jinks ordered [Petitioner] to put his hands up. [Petitioner] did not have identification and gave Investigator Jinks a false name. [Petitioner] was arrested on a driver's license offense. During the search of the vehicle, Investigator Jinks discovered a cell phone and battery next to the seat of the vehicle. He surmised that the sound he heard originated when [Petitioner] took apart the battery and cell phone and dropped it next to the seat of the vehicle. Investigator Jinks inserted the battery back into the phone and turned it on. Investigator Jinks dialed the number, XXX-XXX-2960, listed under "D" in Ms. Maples's phone and the phone he found in the vehicle rang. Additional items found in the vehicle were a bag of trash, empty plastic bags, and a baby powder bottle with the top cut off. In all, five cell phones, including one with phone number XXX-XXX-2960, were found during the search of the vehicle. The XXX-XXX-2960 phone number was listed as "D" in numerous other phones already found during the investigation. The phone associated with number XXX-XXX-4396 was another of the phones found during the search. At the scene, several officers overheard Ms. Maples ask Mr. Green, "[W]hat's D going to jail for? What's D being arrested for?" Ms. Maples consented to a search of her apartment. Investigator Jinks found digital scales and drug paraphernalia, including a piece of cotton that appeared to have been used as a filter. The cotton had the same "bluish-grey" color of the heroin purchased by Ms. Bryant.

On July 2, 2013, Officer Jinks and Ms. Bryant placed a controlled phone call to number XXX-XXX-9692 and spoke to [Petitioner]. While discussing the rental house, [Petitioner] agreed to give Ms. Bryant "two grams" if she rented the house in her name. That same day, Investigator Jinks conducted a "trash pull" at 1313 New York Avenue where he found a utility bill in Ms. Maples's name, rubber gloves, packaging for a T-Mobile prepaid cell phone, a piece of paper with a list of phone numbers and the cost of each phone line, a plastic cover for a digital scale, a burnt spoon, a piece of straw, and receipts from stores located in Lansing, Michigan, and Findlay, Ohio. Investigator Jinks also found a small baggie that contained residue that field tested positive for heroin.

Investigator Jinks and Ms. Bryant made a controlled phone call to number XXX-XXX-5584 and spoke to Mr. Green on July 11, 2013. Ms. Bryant asked when "D"

was coming back. Mr. Green informed her that "D" would be back the next day and "guessed" he would [] bring something good back with him. On July 16, 2013, another controlled phone call was placed by Ms. Bryant to Mr. Green at the XXX-XXX-5584 number. Ms. Bryant told Mr. Green that she had been trying to reach [Petitioner]. Mr. Green said that [Petitioner] had not come back to Knoxville yet and that Mr. Green was out of the drug she was asking for, but suggested he could get Ms. Bryant some oxymorphone.

On July 21, 2013, Mr. Green called Ms. Bryant and requested a ride. She picked him up and dropped him off at an Econo Lodge on Merchant's Drive. Upon walking in to the hotel room, Ms. Bryant saw a lot of blue pills and between $10,000 and $20,000 in cash. Mr. Green told her that there was $20,000, and that he was taking the money on a Greyhound bus to Detroit.

On July 31, 2013, Investigator Jinks learned that [Petitioner] was at Mr. Ford's residence at 173 Chickamauga Avenue. Investigator Jinks observed a white SUV with an out-of-state license plate pull into the driveway. [Petitioner] got out of the SUV and entered the residence. After a few minutes, [Petitioner] came back outside and left in the SUV. The same SUV was later seen at the residence of Mr. Strickland on Adcock Street. Investigator Jinks decided to arrest [Petitioner] on outstanding warrants. Search warrants were obtained for Mr. Ford's and Mr. Strickland's residences.

During the search of Mr. Ford's home, officers found a baggie containing marijuana, drug paraphernalia, plastic baggies that indicated narcotics packaging, a ledger with items marked "M" and "H", a cell phone, and prescription bottles that contained a different number of pills from what was actually prescribed. Officers also found a note that appeared to be a speech that Mr. Ford had intended to say to [Petitioner]. During the initial search, in total, officers also found 38 tablets of oxycodone, 28 tablets of oxymorphone, and 1.9 grams of marijuana. Mr. Ford arrived home after the search began. In a later interview, Mr. Ford indicated there was heroin in the house that police did not find during their initial search. Mr. Ford consented to another search, and officers found 4.7 grams of heroin hidden in a pill bottle inside a sock drawer.

Ms. Maples, Mr. Ford, and Ms. Huffaker all identified [Petitioner] as "D", and as the person in charge. They each pled guilty to their involvement in the conspiracy. Ms. Maples and Ms. Huffaker each made multiple trips between Knoxville and Detroit to transport drugs. The drugs were delivered to 1313 New York Avenue. The drugs were stored in baby powder bottles. Each bottle held twenty to thirty grams of heroin. Two to three bottles arrived at a time. The bottles were transported using rental cars or Greyhound buses. The group would cut the top off the baby powder bottles to remove the drugs.

Ms. Maples used at least 300 grams of heroin for her personal use and sold at least another 200 grams during the time of the conspiracy. At the time of trial, she was

serving an eight-year sentence for convictions related to this case. Ms. Huffaker used approximately 600 grams of heroin in the time she knew [Petitioner] and that [Petitioner] personally gave her at least half of the 600 grams.

[Petitioner] was in possession of large amounts of heroin, usually between thirty and eighty grams at any given time. On one occasion, [Petitioner] threw "a little bit of blue powder substance" at Mr. Ford and told him that it was heroin. On another occasion, [Petitioner] gave Mr. Ford 25 oxycodone pills and about one gram of heroin and asked Mr. Ford if he could "do anything with those." Mr. Ford understood that [Petitioner] was asking him to sell drugs and agreed to sell them. Mr. Ford used envelopes and ledgers to keep track of money he owed to [Petitioner]. Mr. Ford delivered the money to the property at 1313 New York Avenue. Mr. Ford gave [Petitioner] at least "a couple thousand dollars" each time he delivered money. During one delivery, [Petitioner] pulled a "big sack" of heroin out of his pocket containing about 38 to 40 grams. [Petitioner] let Mr. Ford know that [Petitioner]'s girlfriend would be delivering pills to Mr. Ford's house. [Petitioner] arrived at Mr. Ford's house after his girlfriend and removed baby powder bottles from her bag. [Petitioner] gave Mr. Ford 100 pills and kept "[a]t least a couple hundred more" pills for himself. Pills were delivered to Mr. Ford's house this way on two other occasions.

[Petitioner] had scheduled court dates for driving without a license and for criminal impersonation on July 10, 2013, and August 21, 3013. [Petitioner]'s bail bond was forfeited which indicated that he did not appear for either court date.

Investigator Jinks learned the phone numbers involved and issued a subpoena to the cell phone company and received the phone records []. The phone numbers involved were XXX-XXX-2960, XXX-XXX-4396, XXX-XXX-9692, XXX-XXX-7405, and XXX-XXX-5584. The records showed that phone number XXX-XXX-2960 being used regularly in Detroit and Knoxville. The phone associated with XXX-XXX-9692 was found broken during the arrest of [Petitioner] on July 31, 2013. The phone associated with XXX-XXX-7405 belonged to Mr. Strickland and was found during a search of his home on July 31, 2013. Lastly, the phone associated with XXX-XXX-5584 was registered in the name of "Eddie Bang a Hoe." "Eddie Bang a Hoe" was the alias connected with Mr. Green.

[Petitioner] did not testify or present any evidence.

\*       \*       \*

*Motion for New Trial*

[Petitioner] timely filed a motion for new trial. In the motion for new trial, [Petitioner] argued that he received ineffective assistance of counsel, that the trial court erred by failing to investigate [Petitioner]'s dissatisfaction with his attorney-client relationship, that the trial court erred by allowing hearsay testimony, that the State engaged in prosecutorial misconduct, that a search warrant was invalid, that

the trial court failed to include lesser-included offenses in the jury instructions, that the State did not provide witness statements prior to trial, that there was a variance between the presentment and the proof at trial, that there was newly discovered evidence, that [Petitioner]'s right to a speedy trial was violated, that the trial court erred by failing to rule on several pre-trial motions, that the State introduced multiplicitous counts, that the State improperly introduced evidence of prior bad acts, that the trial court denied [Petitioner] his right to effective counsel, that the State's witnesses made perjured statements, that [Petitioner] was convicted on guilt transference, that the evidence was insufficient to convict [Petitioner], that the trial court made errors in the jury instructions, that the State retaliated against [Petitioner] by asking for a harsher sentence because [Petitioner] exercised his right to appeal, that the State improperly vouched for witnesses, that [Petitioner]'s right to confront witnesses was violated, that [Petitioner] was prejudiced in closing arguments, and that the trial court failed to act as the thirteenth juror.

*Hearing on the Motion for New Trial*

Retained counsel testified that he represented [Petitioner]. He identified several motions that he initially filed on behalf of [Petitioner], including: (1) a motion for severance of unrelated counts; (2) a motion for discovery; (3) a motion for bond reduction; (4) a motion in limine to exclude evidence about [Petitioner]'s involvement in prostitution; (5) a motion to suppress evidence obtained during [Petitioner]'s arrest; (6) a motion to suppress GPS evidence; (7) a motion to suppress [Petitioner]'s statement; (8) a motion to strike alias; (9) a motion for the State to give notice of any incentives offered to witnesses; (10) a motion for disclosure of exculpatory evidence; (11) a motion for severance of co-defendants; (12) a *Bruton* motion; (13) a motion for speedy trial; (14) a motion to suppress evidence seized from a cell phone; (15) a motion to suppress pen register, trap, and trace information; and (16) a motion for a continuance due to additional discovery. The motion for speedy trial was dated March 12, 2015. The motion for continuance was filed on July 23, 2015. Retained counsel withdrew from the case prior to trial based on [Petitioner]'s refusal to cooperate. He testified that he turned all discovery materials and other documentation over to appointed trial counsel. Retained counsel testified that he had a legitimate basis for each of the motions filed. Retained counsel testified that he sent a letter to the State asking for copies of documentation concerning the search at 173 Chickamauga Avenue. He acknowledged that he received the documentation and had notice of what evidence was collected during the search. Retained counsel recalled that he sent a letter to the State on April 25, 2014 [requesting] discovery. Retained counsel also notified [Petitioner] of the request. He also recalled that he sent a letter to the State in which he explained that he could not open the video files that were received in discovery [and] the State explained how to open the files. Retained counsel did not recall receiving information regarding the confidential informant. He identified a debriefing of Ms. Maples, dated April 8, 2015; a debriefing of Mr. Strickland, dated June 12, 2015; a debriefing of Ms. Bryant, dated June 18, 2015; and a debriefing of Ms. Huffaker, dated July 10, 2015. Retained counsel saw these documents when

9

he represented [Petitioner]. He went over everything he received in discovery with [Petitioner]. Retained counsel also recalled that [Petitioner] was "extremely uncooperative." He testified that [Petitioner] missed appointments and did not appear for court dates. Retained counsel could not recall [] which recordings he received in discovery. He did not recall which motions were heard, or which witnesses he would have called at trial. Retained counsel testified that he was not "at the point to develop our trial strategy, because the motions had not been heard" and he was "having difficulty getting [Petitioner] to be serious about looking at this case." Retained counsel testified specifically about the motion to suppress GPS evidence. He stated:

> [T]he GPS motion, where they were tracking him through Ohio, when [Petitioner] was coming from Detroit to Knoxville, if that motion had been granted then, obviously, [the State] wouldn't have been able to use that GPS information, but [the State] could still use the proof that [the State] had developed in Knoxville that [Petitioner] was involved in a heroin conspiracy here. So it would have affected the trial some. Would it have affected the trial ultimately? No. Because there was other evidence than that.

Retained counsel agreed that, generally speaking, successful or unsuccessful motions impacted his trial strategy one way or another. He did not recall the criminal history of Ms. Bryant.

On cross-examination, retained counsel explained that he told [Petitioner] that it was very important to attend meetings to review discovery. He agreed that in complex cases, discovery can take a long period of time. He acknowledged that the difficulty was not the amount or lack of discovery, but [Petitioner]'s refusal to cooperate. Retained counsel testified that many of the motions filed were filed early on in the case, and that as his investigation continued, some of the motions would need to be amended or withdrawn. He acknowledged that some motions to suppress were either not filed at all or would not have been granted because [Petitioner] lacked standing to raise the issues. Retained counsel recalled that there was a pen register, track and trace on [Petitioner]'s phone and that it was put on [Petitioner]'s phone by authorities in either Ohio or Michigan. Retained counsel recalled that [Petitioner] was identified by others as "D." Retained counsel filed the motion to strike alias because he was worried about any alias. Retained counsel testified that none of the motions he filed were dispositive.

Mr. Holloway testified that he was a co-defendant in the conspiracy with [Petitioner]. Mr. Holloway was arrested in Ohio on January 3, 2013 and was released sometime in March 2013. He was re-incarcerated in May 2013. Mr. Holloway was interviewed by the State in August 2016, prior to [Petitioner]'s trial. Mr. Holloway, the State's attorney, and Investigator Jinks were present for the interview. Mr. Holloway testified that the interview focused primarily on his Ohio arrest. He said that it was just him, Mr. Allen, and Ms. Ferris that were in the

10

vehicle in Ohio when it was pulled over and drugs were found.  Mr. Holloway said that he was "pretty sure [counsel for the State] was taking notes [during the interview]," but that he did not know if the interview was recorded.  Mr. Holloway claimed no one contacted him on [Petitioner]'s behalf.  He stated that if he had been asked to testify at [Petitioner]'s trial, he would have said that [Petitioner] had nothing to do with the Ohio arrests, as [Petitioner] was not present at the time.  Mr. Allen was his drug contact.  Mr. Holloway stated that he did not know from whom Mr. Allen got drugs.  On cross examination, Mr. Holloway admitted that he was from Detroit and that [Petitioner] was his cousin.  He stated that he could only speak to the "the Ohio situation because [he's] going off of the date that [the State] said the conspiracy started [,] January 3, [2013]."  Mr. Holloway admitted that he pled guilty to the conspiracy and that he agreed with the factual basis for the plea.  He claimed that he did not know if [Petitioner] had any involvement with Ms. Maples, Ms. Huffaker, or Mr. Ford.

Mr. Allen, a co-defendant, testified that no one contacted him on [Petitioner]'s behalf and that he was not subpoenaed to testify at the trial.  He did not know the owner of the phone number XXX-XXX-4396 and [] no phones were seized from him.  Mr. Allen stated that he did not know what happened to his phone as he did not have it with him when he was arrested.  Mr. Allen claimed that he had nothing to do with [Petitioner] and [] received no drugs from [Petitioner].  On cross examination, Mr. Allen admitted that he had several felony convictions in Ohio and Michigan.  He stated that [Petitioner] and most of the co-defendants grew up together in the same neighborhood in Detroit.  Mr. Allen said that Mr. Holloway was known as "Midnight" and that Mr. Strickland was known as "Man."  He admitted that he was involved in the conspiracy to sell heroin.  Mr. Allen stated that he "never knew that [he] [pled] out to conspiracy.  [He] thought [he] was pleading out to selling drugs."  Mr. Allen did not know that he was convicted of conspiracy until he received his "TOMIS" sheet in prison.  Mr. Allen claimed that he did not recall that the word conspiracy was used numerous times during his guilty plea.  He admitted that he lived at 1313 New York Avenue and that [Petitioner] came by to "just smoke weed."  Mr. Allen knew that Ms. Maples rented the house at 1313 New York Avenue.  Mr. Allen admitted to selling heroin at the house, and that he brought it from Adair Manor Apartments.  He said that he got the heroin from someone with the street name of "D."  Mr. Allen could not recall his own cell phone number.  He admitted he lied to police about his real name.  Mr. Allen knew "three or four D's," although he could not name them when questioned and called them "homeboys."  Mr. Allen stated that [Petitioner]'s nickname was "Nard."  He could not recall if he had [Petitioner]'s phone number stored in his phone under "D," but claimed that it was probably stored under "Ricco."  Mr. Allen stated that other people used his phone and that they could have put the phone number [] under the name of "D."  Mr. Allen admitted that he sold heroin at the Adair Manor Apartments.  He also recalled that [Petitioner] was at the Adair Manor Apartments.  Mr. Allen claimed that he gave Ms. Maples the money to put the 1313 New York Avenue house in her name.  He admitted that the heroin he sold was "bluish-grey" in color, an unusual color for heroin.  When he was arrested in June 2013, Mr. Allen said that Mr. Green

11

was in the vehicle with him. Mr. Allen admitted to "smoking dope" with Mr. Ford's daughter at 173 Chickamauga Avenue.

[Petitioner] testified that he received trial counsel's phone number from retained counsel. [Petitioner] stated that he was "steady calling [trial counsel] asking him to set a motion court date. So [Petitioner's] motions can be heard. No answer. No contact. Not nothing from [trial counsel]." [Petitioner] claimed that he called at least two or three times a month and left messages with trial counsel's office. [Petitioner] said that his phone number remained the same from the day trial counsel was appointed to the present day. [Petitioner] testified that he had not seen the phone records for XXX-XXX-2960, XXX-XXX-9692, or XXX-XXX-7405. He stated that he never saw the recordings or pictures of the controlled buys between Mr. Allen and Ms. Bryant. [Petitioner] did not receive pictures of money seized from Mr. Allen during Mr. Allen's arrest on June 21, 2013. [Petitioner] admitted that retained counsel showed him photographs of the baby powder bottle found in the trunk of his vehicle during [Petitioner]'s June 28, 2013 arrest. [Petitioner] saw photographs [] from Ms. Maples's purse that were taken during the June 28, 2103 arrest. [Petitioner] recalled that retained counsel showed him the rental application that Ms. Bryant completed. [Petitioner] testified that any discovery provided to him was supplied by retained counsel and that trial counsel never showed him anything. [] [Petitioner] testified that he asked for, but never received, a recording of his interview with Investigator Jinks. [Petitioner] insisted the interview contained exculpatory evidence. [Petitioner] received a copy of the search warrant, affidavit for the warrant, and all evidence seized from Mr. Ford's house from a private investigator in August 2017. [Petitioner] stated he received all information about the search of Mr. Adcock's residence before the trial. [Petitioner] stated that he did not see any of the debriefings of co-defendants or Ms. Bryant until appellate counsel gave them to him in August 2017.

[Petitioner] stated that trial counsel met with him one time for about 45 minutes between August 8, 2016 and August 10, 2016 but did not go over any discovery materials or trial strategy with him. Trial counsel presented a plea offer of fifteen years at 100 percent to [Petitioner]. [Petitioner] testified that when was transferred to the jail for trial he was in "classification" and could take no visitors, so it was impossible that trial counsel to meet with him on August 8, 2016.

[Petitioner] stated that the majority of continuances were due to the State and that his demand for speedy trial was filed on March 12, 2015. [Petitioner] recalled that retained counsel withdrew as counsel on August 31, 2015, the same day he filed a continuance because the State added additional discovery. The case was reset for trial on February 22, 2016. [Petitioner] did not agree to reset the February 22, 2016 date to August 8, 2016, "because [he] never got in contact with [trial counsel]." He had no contact with trial counsel before August 8, 2016. [Petitioner] stated that he and trial counsel "never sat down and built a defense or had his pretrial motions heard so [Petitioner] could know what evidence can be introduced in trial . . . ."

[Petitioner] could not build a defense with a lawyer that [Petitioner] never met before."

[Petitioner] told the trial court that he wanted to go to trial even though he had not met trial counsel. [Petitioner] stated that he had gone over all of the discovery that he had been given, but that he did not know there was other evidence and discovery that he had not seen. [Petitioner] testified that if he had seen all the evidence that he could have made a better decision about moving forward with the trial or pleading guilty. [Petitioner] said that he did not learn the identity of the confidential informant until the trial. He stated that during the trial he told trial counsel to call Mr. Holloway, Mr. Green, Mr. McFadden, Mr. Strickland, Mr. Allen, and Mr. Pate as witnesses on his behalf. [Petitioner] recalled he told trial counsel to "move for a dismissal or [make] an argument due to a speedy trial" on August 8, 2016 and that trial counsel did not want to.

[Petitioner] denied knowing or ever meeting Mr. Ford and knew of no reason why Mr. Ford would identify him as his narcotics supplier. He claimed that after reviewing the search warrant affidavit for Mr. Ford's house, he "noticed false and misleading information." In paragraph 11, the affidavit read:

> On July 31[], 2013, Officer Jinks began receiving information from the Michigan State Police Metro Narcotics Task Force that the GPS surveillance on [a] cellular phone with [the] number [XXX-XXX-9692] [] was traveling [] towards Knoxville. This is the cellular telephone last known to have been [in] possession of [Petitioner]. At approximately noon[,] the phone was located at [] 1123 Adcock Avenue through GPS surveillance. The GPS surveillance data verified that the cellular telephone [XXX-XXX-9692] known to be used by [Petitioner] travelled to [] 173 Chickamauga Avenue []. Physical surveillance was picked up at [that residence]. Your affiant was told by Officer Jinks that he watched as a black male matching the description of [Petitioner] exited the residence and got into the rental vehicle and drove back to 1123 A[d]cock. After that CS1 placed a consensually recorded telephone call to [XXX-XXX-9692] and made contact with [Petitioner] who verified that he was in town and that he had blueberry for [sale] for $30.00 each. Your affiant knows that blueberry is common street slang for 30 milligrams oxycodone tablets.

[Petitioner] stated that this was the subject of the motion to suppress GPS evidence. [Petitioner] claimed that XXX-XXX-9692 was not his phone. [Petitioner] stated that his phone number had a 517 area code, but could not remember the rest of the number. [Petitioner] recalled he was not made aware of the recorded phone calls and phone records until trial. He stated that had he known all of this evidence was being presented at trial he would never have told the trial court that he had gone through discovery a thousand times.

13

On cross-examination, [Petitioner] claimed that retained counsel lied on the stand when he said that he could not contact [Petitioner] and that [Petitioner] failed to meet with him to talk about discovery. [Petitioner] admitted that he missed one court date. [Petitioner] opined that retained counsel did not give him video recordings. He claimed that retained counsel lied about having the debriefings.

[Petitioner] claimed that he did not know Ms. Bryant at all and was never provided debriefings from trial counsel. [Petitioner] denied that it was his voice on recordings from phone number XXX-XXX-9692 that were played during the hearing. [Petitioner] reiterated that XXX-XXX-9692 was not his phone. [Petitioner] admitted that because it was not his phone, he had no standing to complain about the GPS tracking and that any motion to suppress was moot. [Petitioner] said that Investigator Jinks lied about finding the phone assigned to XXX-XXX-9692 in the vehicle on the day he was arrested. He stated that the affidavit incorrectly stated that he traveled down I-75. He stated he was already in town and staying at Mr. Strickland's residence on Adcock. He denied that he had regular contact with Mr. Allen using the XXX-XXX-9692 number.

[Petitioner] denied that trial counsel came to see him in jail on August 8, 2016, at 2:54 p.m., even though the jail records showed otherwise. He testified the only day he met with trial counsel was on August 9, 2016, for forty five minutes. [Petitioner] testified that each co-defendant lied during the trial because they received a deal from the State.

Trial counsel was called as a witness at the Motion for New Trial hearing. He recalled the pre-trial motions filed by retained counsel, before him. Trial counsel read the following from the trial transcript:

> The Court: We have no motions pending.
> [Petitioner]: I got a motion.
> The Court: This is your lawyer. He has – [trial counsel], he's saying [retained counsel] has filed 12 motions.
> [The State]: I've addressed those in this court in front of your Honor.
> The Court: Okay
> [The State]: You've already ruled on them.
> The Court: Okay. No. We've heard the motions. All of them.
> [Petitioner]: Not mine, your Honor.

Trial counsel stated that he reviewed the entire file he received from retained counsel and the State. The trial court asked if everyone could agree that the motions were not heard pre-trial. The State responded that some had been heard and others had not. The State agreed that the suppression motions had not been heard. Trial counsel stated that it was his understanding that all pre-trial motions had been heard and ruled on. Trial counsel did not recall if he had seen the chart regarding contact

14

between co-defendants. Trial counsel acknowledged that he received three messages from [Petitioner] dated December 7, February 2, and October 5. None of the messages stated the year, but Trial counsel conceded that the messages would have corresponded with the time frame that he represented [Petitioner]. Trial counsel stated that he would not have contacted or called any of [Petitioner]'s co-defendants as witnesses, as he understood that the co-defendants were cooperating with the State. Trial counsel did not recall if [Petitioner] spoke to him about favorable witnesses. Trial counsel recalled several phone calls he made to [Petitioner], but he did not remember actually speaking to [Petitioner]. He remembered speaking with a female when he called [Petitioner]. Trial counsel stated that [Petitioner] never came to meet with him. Trial counsel did not send [Petitioner] any further discovery. Trial counsel did not recall a meeting between Mr. Holloway and the State or viewing the criminal record of Ms. Bryant. Trial counsel stated that he and [Petitioner] did not go over the entirety of discovery during their meetings. They discussed which witnesses were going to be called, as trial counsel had been informed "a number of co[-]defendants that were going to testify." Trial counsel stated that he did not watch the videos and that he did not recall going over the phone records. Trial counsel recalled that he had been through the discovery, but had not met with [Petitioner], so he was asking for a couple of weeks' continuance. Trial counsel stated that he would rather have had a couple of weeks instead of two days, but that he did the best he could with what he had. Trial counsel testified he understood that [Petitioner] had copies of everything and that [Petitioner] had either reviewed it himself or with retained counsel. Trial counsel stated that [Petitioner] wanted to go to trial and that [Petitioner] told him that he had been over the discovery a "ton of times." [] Trial counsel did not recall any surprises at trial. Trial counsel did not file a motion to dismiss on a violation of the right to a speedy trial [or] recall [Petitioner] asking him to file a motion for speedy trial. Trial counsel did not recall if he objected to evidence concerning [Petitioner]'s failure to appear charges. He admitted that he did not object to the admissibility of evidence collected from the vehicle on June 28, 2013.

On cross examination, trial counsel testified that [Petitioner] lived in Michigan during the time he represented [Petitioner]. Trial counsel was an appointed attorney, and it was not practical for him to travel to Michigan to meet with [Petitioner]. Trial counsel responded to each of [Petitioner]'s messages and made efforts to reach out to [Petitioner], but [Petitioner] never came to meet with him. Trial counsel agreed that because [Petitioner] did not come see him, his ability to prepare for trial was hampered. Trial counsel wanted a continuance to properly prepare with [Petitioner], but [Petitioner] was adamant about proceeding to trial. Trial counsel felt that [Petitioner] could not ask for both a continuance and a speedy trial. He agreed that pursuit of a speedy trial motion, when [Petitioner] would not meet with him to prepare for trial, would be problematic. Trial counsel stated that [Petitioner]'s missed court appearances caused problems. He did not recall why the trial date was continued on February 22, 2016.

15

At the conclusion of the hearing, appellate counsel conceded that [] the motion to sever co-defendants, the motion for discovery, the motion in limine regarding prostitution, the motion to suppress [Petitioner]'s statement, the motion for *Brady* material, and the motion for severance regarding co-defendants' statements were moot. Appellate counsel conceded that the motion for bond reduction was heard and ruled on [but] did not agree that the motions for striking alias, for the State to give notice of incentives, for the demand for a speedy trial, to suppress evidence from the cell phones, and to sever charges were moot.

During the hearing on the motion for new trial, the trial court commented that he believed [Petitioner] perjured himself during his testimony. The trial court further noted that the voice heard on the recorded phone calls sounded "remarkably like that of [Petitioner]."

The trial court found that

> [a]ssuming arguendo, that trial counsel was ineffective for failing to litigate these motions (which this [c]ourt does not hold) there is no evidence within this record supporting the second prong of the *Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)] test. This [c]ourt may not presume, nor may it infer, that a different outcome may have resulted had the motions been litigated. Moreover, this defendant does not have standing to challenge any search of co-conspirator Tim Ford's residence.

As to trial counsel's lack of preparation for the trial, the trial court found that [Petitioner] "may not now complain that the narrative he directed does not have the happy ending he desired." The trial court found that [Petitioner] insisted that he had reviewed all discovery and [Petitioner] stated that "I'm ready to go [to trial] today, Your Honor." The trial court accredited the testimony of retained counsel and trial counsel that [Petitioner] would not cooperate in preparation for trial.

The trial court found that "the evidence of [Petitioner's] participation within the alleged conspiracy was overwhelming[,]" [] that the witnesses implicated [Petitioner]'s participation[,] and that their testimony was corroborated by the evidence. The trial court stated:

> [Petitioner]'s self-serving attempt to repudiate this evidence is not credible. Nor does this [c]ourt find as credible the testimony of [Mr.] Allen and [Mr.] Holloway wherein each asserts that [Petitioner] had no role in the conspiracy for which he was convicted.
>
> This [c]ourt has spent considerable time reading the technical record in this case, reading the trial transcript, and carefully reviewing all

16

of the grounds [Petitioner] has raised in support of his assertion that he is entitled to a new trial.

The trial court denied the motion for new trial. It is from that denial that [Petitioner] now appeals.

*State v. Winbush*, No. E2018-02136-CCA-R3-CD, 2020 WL 1466307, at \*1–10 (Tenn. Crim. App. Mar. 24, 2020), *perm. app. denied* (Aug. 6, 2020) (footnotes omitted) ("*Winbush*"). The TCCA vacated Petitioner's convictions for Counts 3 and 4 of the presentment because of Petitioner's trial counsel's failure to object to the fact that the jury instructions for those counts did not match the presentment charges but affirmed Petitioner's other convictions. *Id.* at \*1, \*15, \*27.

After he filed a state court habeas corpus petition,[1] Petitioner filed his pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 [Doc. 2] asserting the following claims:

1. The evidence is insufficient to sustain his convictions [*Id.* at 10–14; Doc. 6];

2. Counsel was ineffective for (1) failing to pursue the motion to suppress the cell phone evidence; (2) failing to pursue the motion to suppress the GPS evidence; (3) eliciting evidence of a prior bad act; (4) failing to request a jury instruction for facilitation; (5) failing to request a jury instruction on accomplice corroboration; (6) failing to file a motion to dismiss due to a speedy trial violation; (7) commenting on Petitioner not testifying at trial; (8) failing to investigate favorable witnesses; (9) failing to discover exculpatory evidence; and (10) failing to object to illegally obtained evidence [Doc 2 p. 15–50];

3. The prosecution improperly failed to disclose a statement from Mr. Holloway [*Id.* at 50–53];

4. The prosecution improperly inflamed the emotions of the jury [*Id.* at 53–54];

5. The prosecution improperly vouched for trial testimony [*Id.* at 54];

6. The prosecution introduced evidence obtained from an illegal search and seizure [*Id.* at 55–56];

7. A new rule of law establishes that GPS and cell phone evidence introduced at his trial was illegally obtained [*Id.* at 56–58]; and

---

[1] The state court dismissed Petitioner's state court habeas corpus petition [Doc. 24-3] and the arguments therein [Doc. 24-1] are not relevant to this action.

17

8. Cumulative errors at his trial entitle him to habeas corpus relief [*Id.* at 58–61].

Respondent filed a response in opposition to the § 2254 petition [Doc. 25], as well as the state record [Doc. 20]. Petitioner filed a reply [Doc. 28].

## II.     STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq*., a district court may not grant habeas corpus relief for a claim that a state court decided on the merits unless the state court's adjudication of the claim:

> (1)        resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)        resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). This standard is hard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts that presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## III.    ANALYSIS

## A.     Exhaustion Requirement

The Court must first examine whether Petitioner, a state prisoner, exhausted his available state court remedies for his claims, as he must do before the Court may grant him habeas corpus relief. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" each federal claim to all levels of the state appellate system

18

by presenting the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).

Where a petitioner no longer "has the right under the law" to properly exhaust a claim with the state courts, the claim is technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (providing that "when a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule). Procedural default may also occur when a petitioner presented the claim to the highest court but the state court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground. *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citation omitted).

"Federal courts lack jurisdiction to consider a habeas petition claim that was not fairly presented to the state courts." *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (citation omitted). Thus, a prisoner's procedural default of a claim forecloses federal habeas review unless the petitioner shows cause to excuse his failure to comply with the procedural rule and actual prejudice from the constitutional violation. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Respondent contends that Petitioner did not exhaust the following two claims in his § 2254 petition: (1) Petitioner's claim (Claim 4) that the prosecution improperly inflamed the emotions of the jury and (2) Petitioner's claim (Claim 5) that the prosecution improperly vouched for testimony from Ms. Maples at trial by stating that the jury could "believe Ms. Maples was telling the truth" [Doc. 25, p. 44–45]. Specifically, as to Petitioner's claim that the prosecution improperly inflamed

19

the jury's emotions, Respondent states that the TCCA did not reach the merits of this claim because Petitioner's counsel did not object at trial, and therefore waived this argument under Tennessee law [*Id.* at 44]. As to Petitioner's vouching claim, Respondent notes that while Petitioner asserted other vouching claims in his appeal of his convictions, he did not assert such a claim as to the statement about Ms. Maples he cites in his petition, and therefore procedurally defaulted this claim [*Id.* at 45–46]. In his reply, Petitioner requests that the Court excuse his default of these claims because it was due to the ineffective assistance of his appellate counsel [Doc. 28, p. 21–24].

The record establishes that Petitioner procedurally defaulted his claims that the prosecution inflamed the emotions of the jury and improperly vouched for Ms. Maples's credibility by stating that the jury could believe her. Moreover, while Petitioner seeks to excuse his procedural default of these claims by blaming the ineffective assistance of his appellate counsel, Petitioner cannot rely on the ineffective assistance of his appellate counsel to establish cause to excuse a procedural default in a federal habeas corpus action without first exhausting that ineffective assistance of appellate counsel claim in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (providing that "an ineffective-assistance-of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). The record establishes that Petitioner did not exhaust an ineffective assistance of appellate counsel claim with the Tennessee courts. Accordingly, Petitioner has not set forth cause to excuse his procedural default of these claims, and the Court will not address them on the merits.

Additionally, the Court notes that Petitioner did not present his claim that the prosecution presented illegally seized cell phone evidence in his trial that he raises in his § 2254 petition to the TCCA, but rather only asserted that (1) his counsel was ineffective for not pursuing motions to suppress and/or objecting to this evidence and (2) that the trial court erred in not granting him a

new trial due to its failure to hear his pretrial motions to suppress this evidence prior to trial [Doc. 20-29]. Respondent does not raise Petitioner's procedural default of this claim in response to the § 2254 petition but instead argues that Petitioner presented his Fourth Amendment claim in his appeal, presumably through the aforementioned arguments, and that this claim therefore is not cognizable in this action [Doc. 25, p. 46–47]. However, this is incorrect because, as set forth above, Petitioner must have presented the same claim under the same theory to the TCCA in order to have exhausted it, and the record establishes that he did not present a free standing claim asserting that the prosecution presented illegally obtained evidence at his trial to the TCCA.

Nevertheless, the Court may raise the issue of Petitioner's procedural default of this claim *sua sponte. Elzy v. United States,* 205 F.3d 882, 886 (6th Cir. 2000). As it was in *Elzy*, Petitioner's procedural default of this claim is obvious from the record. Moreover, he cannot excuse that default by blaming his appellate counsel, as the record establishes that Petitioner did not exhaust any such ineffective assistance of appellate counsel claim in his pro se petition for post-conviction relief [Doc. 24], and he cannot do so now.

Accordingly, the Court *sua sponte* finds that Petitioner also procedurally defaulted his claim that the prosecution presented illegally obtained cell phone evidence at his trial and will not address it on the merits.

## B. Sufficiency of the Evidence

Petitioner first challenges the sufficiency of the evidence underlying all his convictions [Doc. 2, p. 10–14; Doc. 6]. In denying this claim in Petitioner's direct appeal, the TCCA stated:

> When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto

the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Id.* (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Therefore, the prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *Smith*, 24 S.W.3d at 279). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *Dorantes*, 331 S.W.3d at 379; *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Tennessee Code Annotated section 39-12-103(a) defines conspiracy as follows:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

As charged in this case, "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver, or sell the controlled substance." T.C.A. § 39-17-417(a)(4). Heroin, oxycodone, and oxymorphone are all controlled substances. T.C.A. §§ 39-17-406(c)(11) - 408(b)(1)(M)-(N).

Defendant asserts that his convictions relied heavily on accomplice testimony. A conviction "may not be based upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). This Court has explained:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to

22

support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that that corroboration extend to every part of the accomplice's evidence.

*State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. Sept. 24, 1992).

Defendant maintains that the majority of the evidence came from testimony of his alleged accomplices, that any testimony from Ms. Bryant is suspect, that he was never found in possession of any drugs, and that all circumstantial evidence against him was unlawfully obtained. Ms. Bryant completed a rental application on behalf of Defendant. Recorded phone conversations revealed that Defendant would pay any fees or rent associated with the rental house and give Ms. Bryant heroin in exchange for her completion of the application.

Additionally, a recorded phone conversation between Mr. Green and Ms. Bryant stated that "D" was returning from Detroit. Investigator Jinks testified that "D" referred to Defendant. Investigator Jinks also testified that he heard Ms. Maples and Mr. Green refer to Defendant as "D" when Investigator Jinks arrested Defendant. Investigator Jinks also saw Defendant at multiple properties associated with the conspiracy. Therefore, the record shows that the testimony of Ms. Maples, Ms. Huffaker, and Mr. Ford were amply corroborated.

Each of the co-conspirators testified that Defendant was in charge of a network that trafficked controlled substances from Detroit to Knoxville. Recorded phone calls and text messages corroborated that Defendant was in charge of the drug network. The controlled buys took place within drug-free zones. Defendant answered the same phone number used by Ms. Bryant to set up the controlled buys with Mr. Allen. Moreover, there was testimony from Ms. Bryant and Investigator Jinks that Defendant had taken over Mr. Allen's activities. Multiple people testified that Defendant delivered heroin and opiate pills to members of the conspiracy. Officers seized drugs at locations where Defendant was known to frequent.

It is reasonable that a jury could conclude that Defendant possessed heroin, oxycodone, and oxymorphone with the intent to sell and deliver them and that he had entered into a conspiracy with the intent to do the same. The evidence is sufficient to support his convictions. Defendant is not entitled to relief.

*Winbush*, at *25–26.

To evaluate challenges to the sufficiency of evidence, federal courts determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

23

*Virginia*, 443 U.S. 307, 319 (1979); *see also Cavazos v. Smith*, 565 U.S. 1, 6–7 (2011) (providing that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326). The courts look to the evidence supporting the conviction with specific reference to the elements of the crime as established by state law. *Id.* at 324 n. 16. However, because the trier of fact is charged with and in the best position to resolve conflicts in the testimony, weigh the evidence, and draw inferences, the Court must defer to its verdict. *Id.* at 319.

As with ineffective assistance of counsel claims, it is incredibly difficult for a petitioner to successfully challenge the sufficiency of the evidence due to the double layer of deference granted to these claims. *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012). Specifically, not only is the trier of fact's verdict given deference, but, under the AEDPA, the federal courts must also defer to the state court of appeals' consideration of this verdict and may overturn it only if the state court was objectively unreasonable. *Id.*

While the TCCA generally addressed the sufficiency of the evidence to support Petitioner's convictions together, it did not articulate its reasons for finding the evidence sufficient for each of the charges as set forth in the presentment. Where the state court fails to articulate reasons to support its decision, the federal court conducts an independent review of the claims. *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006). "'That independent review, however, is not a full *de novo* review of the claims'" but rather requires the Court to "'uphold the state court's summary decision unless the [c]ourt's independent review of the record and pertinent federal law persuades the [c]ourt that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Id.*

(quoting *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) and *Aycox v. Lytle*, 796 F.3d 1174, 1177–78 (10th Cir. 1999) (internal quotation marks omitted)).

Accordingly, the Court will now independently review each of Petitioner's claims challenging the sufficiency of the evidence for each of his convictions based on the language of the presentment to determine whether the TCCA's holding that the evidence was sufficient to support those convictions was an unreasonable application of federal law or an unreasonable determination of the facts based on the evidence.

1.     **Counts 1 and 2: Conspiracy to possession with the intent to sell (Count 1) or deliver (Count 2) 150 grams or more of a Schedule I controlled substance (heroin) in a drug-free zone.**

First, in Counts 1 and 2, the state charged Petitioner with conspiracy to possess with the intent to sell or deliver one-hundred and fifty grams or more of heroin, with the overt act specified as August Allen selling heroin to an agent of the Knoxville Police Department ("KPD") within one thousand feet of a school on June 20, 2013 [Doc. 20-1, p. 1–2]. Petitioner challenges his convictions by asserting that (1) the prosecution did not provide evidence of his intent or knowledge of this incident; (2) the record is devoid of evidence that Petitioner and his co-conspirators agreed to possess, sell, or deliver the heroin at issue; (3) phone records do not prove these charges; (4) he never possessed drugs or money or actively purchased, sold, or delivered heroin; and (5) there was no independent evidence of him communicating with or participating in the relevant heroin sale or discussing drug prices with his codefendants [Doc. 2, p. 10–12]. Petitioner also notes that the jury acquitted him of the charges in Counts 16 and 17 of the presentment, which he asserts relied on the same evidence as Counts 1 and 2, and therefore claims that the evidence was insufficient to support his convictions for Counts 1 and 2 [*Id.* at 11–12].

The evidence at trial showed that on June 20, 2013, August Allen sold heroin to Ms. Bryant, a KPD confidential informant, at 1313 New York Avenue, a residence within 1,000 feet of a school [Doc. 20-17, p. 61], that Ms. Maples rented and for which Petitioner paid the rent. Investigator Jinks monitored this controlled-buy. *Winbush*, at *2–*3. Also, all of Petitioner's coconspirators who testified at trial identified him as the leader of a drug conspiracy for which August Allen, among others, regularly sold heroin at this time [*see, e.g.*, Doc. 20-13, p. 11–20]; *Id.* at * 2–4.

The evidence of Petitioner's participation in and leadership of the relevant underlying conspiracy at the time of the controlled buy on June 20, 2013, was clear and overwhelming. He claims that the state failed to establish an agreement among the parties that would support the conspiracy conviction [Doc. 2, p. 12]. To the extent that Petitioner challenges the sufficiency of that evidence because it came from his co-conspirators, Respondent correctly notes that the Sixth Circuit has held such evidence is sufficient to support a conviction under federal law. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (providing that "it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court").

Moreover, a conspiracy may be proven by circumstantial evidence. *See United States v. Small*, 988 F.3d 241, 252 (6th Cir. 2021) (providing that "[j]ust as the existence of a conspiracy 'may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence'" (quoting *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008)). That is what we have here. That the evidence was circumstantial, it was no less compelling. He paid the rent for the house where the sale of heroin occurred. His coconspirators all testified that Petitioner was the leader of the conspiracy. Petitioner routinely provided heroin to Mr. Allen to sell. This evidence was sufficient to support Petitioner's convictions.

26

Also, Petitioner's assertion that the fact that the jury acquitted him of Counts 16 and 17 of the presentment, which alleged that Petitioner and Tim Ford knowingly possessed heroin with the intent to sell or deliver in a drug-free zone on July 31, 2013, [Doc. 20-1, p. 23], means that the evidence to support his convictions for Counts 1 and 2 is insufficient because those counts relied on the same evidence has no merit. The offenses alleged in Counts 1 and 2 occurred on different dates and under completely different circumstances than those alleged in Counts 16 and 17, and Petitioner's acquittal for Counts 16 and 17 has no bearing on the sufficiency of the evidence for Counts 1 and 2.

Accordingly, the evidence was sufficient to support these convictions.

**2. Counts 3 and 4: Conspiracy to sell (Count 3) or deliver (Count 4) 150 grams or more of a Schedule I controlled substance (heroin) in a drug-free zone.**

In his motion to amend his petition [Doc. 6], Petitioner challenges the sufficiency of the evidence supporting his convictions for Counts 3 and 4 of the presentment and asserts that, if the Court finds the evidence insufficient to support those convictions, it should also find the evidence insufficient to support Counts 1 and 2 [Doc. 6, p. 1–3]. However, as noted above, the TCCA vacated Petitioner's convictions for Counts 3 and 4 because of his trial counsel's failure to object to the fact that the jury instructions for those charges did not match the presentment and ordered entry of judgments dismissing those counts. *Winbush*, *1, *15. Moreover, the Court has already determined that the evidence was sufficient to support Petitioner's convictions for Counts 1 and 2 of the presentment, as set forth above. Thus, these arguments have no merit.

**3. Counts 7 and 8: Conspiracy to possess with the intent to sell (Count 7) or deliver (Count 8) a Schedule II controlled substance (oxymorphone) in a drug-free zone.**

Counts 7 and 8 of the presentment charged Petitioner with conspiracy to possess with the intent to deliver or sell oxymorphone, with the overt act specified as Petitioner delivering

27

oxymorphone to Tim Ford on July 31, 2013 in a drug-free zone [Doc. 20-1, p. 19–20]. Petitioner

challenges the sufficiency of the evidence to support his convictions for these charges by pointing

out that Tim Ford testified that he was not sure whether Petitioner or another co-conspirator

provided the oxymorphone to him on that day and noting that police never found any drugs on

Petitioner [Doc. 2, p. 12].

However, the Court's review of the relevant testimony and evidence at trial demonstrates

that, drawing all inferences from conflicting evidence in favor of the prosecution, as the Court

must do, the evidence at trial was sufficient to support these convictions. Specifically, evidence

at trial established that police saw Petitioner enter Tim Ford's house on July 31, 2013, and stay for

a few minutes [Doc. 20-10, p. 101–2]. Tim Ford testified that Petitioner brought him drugs during

this visit, specifically stating as follows:

> Q:    Let me stop you. Did he leave you with any pills at that time? You're
>       waiting on the roxies, the blues.
> A:    Yeah. I think a few - - I think, actually, a few moons, maybe - -
> Q:    Okay.
> A:    -- a few moons, maybe - -
> Q:    Okay, so he - -
> A:    Not a lot.

[Doc. 20-15, p. 51]. Tim Ford later testified that he was not sure whether "Slim" or Petitioner

gave him the "moons," also known as oxymorphone, on that day [*Id.* at 66]. Tim Ford also testified

that he had sold some, but not all, of the "moons" he received that day before police raided his

house and found oxymorphone pills, which he specified were not his [*Id.* at 72–73].

While Petitioner emphasizes that Tim Ford at one point professed uncertainty about who

had given him the oxymorphone pills on July 31, 2013, he ignores other compelling evidence to

the contrary. Tim Ford affirmatively identified Petitioner as the one who brought him "the moons"

on that day. While his later testimony equivocated, he did not repudiate what he had told the jury

28

before. Moreover, while Tim Ford stated that he thought Petitioner brought him "a few moons, maybe," this testimony also does not undermine the jury's verdict. Ford clarified that when he said "a few moons, maybe" he was not denying Petitioner gave him any moons. He immediately clarified that statement with "Not a lot," referring to the number he received from Petitioner. The TCCA's treatment of this issue is neither contrary to nor an unreasonable application of the *Jackson* standard for assessing sufficiency of the evidence in a § 2254 proceeding.

Also, while Tim Ford subsequently testified that he could not recall whether Slim or Petitioner had provided him the oxymorphone pills on July 31, 2013, thereby somewhat contradicting his earlier testimony that Petitioner had given him drugs on that day, it is apparent given the other evidence corroborating Petitioner's involvement in this offense, the jury resolved this conflict against Petitioner by finding him guilty of these charges. The Court must defer to that resolution. And it was up to the jury, not this Court, to interpret that testimony and decide how much weight to give that testimony.[2] Accordingly, the evidence was sufficient to support Petitioner's convictions for Counts 7 and 8 of the presentment.

4. **Counts 18–21: Possession with intent to sell (Count 18) or deliver (Count 19) less than 200 grams of Schedule II controlled substance (oxycodone) in a drug-free zone; and Possession with intent to sell (Count 20) or deliver (Count 21) less than 200 grams of a Schedule II controlled substance (oxymorphone) in a drug-free zone.**

---

[2] In *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993), the Tennessee Criminal Court of Appeals recognized that "contradictory [sworn] statements by a witness in connection with the same fact cancel each other." *Id.* "The rule of cancellation applies when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." *State v. Franklin*, 585 S.W.3d 431, 458 (Tenn. Crim. App. 2019)(quotations and citations omitted). This rule of cancellation does not apply here because Investigator Jinks corroborated Petitioner's presence at the residence on 173 Chickamauga Ave. the date of the transaction on July 31, 2013, and the testimony of the other co-conspirators that corroborated Petitioner's involvement in this offense.

Counts 18 through 21 of the presentment charged Petitioner with knowingly possessing with the intent to sell or deliver less than two hundred grams of both oxycodone and oxymorphone in a drug free zone on July 31, 2013 [Doc. 20-1, p. 24–25]. Petitioner challenges these convictions by asserting that there is no evidence that he actually or constructively possessed the oxycodone or oxymorphone that police recovered from Tim Ford's house on July 31, 2013 [Doc. 2, p. 13].

However, as noted above, evidence at trial established that police saw Petitioner, who was the leader of a drug conspiracy that sold oxycodone, oxymorphone, and heroin from January to July 31, 2013, enter Tim Ford's house on July 31, 2013 and stay for a few minutes [Doc. 20-10, p. 101–2]; *Winbush*, at *2–5. According to Tim Ford's testimony at trial, he gave Petitioner five to six thousand dollars during that visit [Doc. 20-15, p. 50]. When police later searched Tim Ford's house on July 31, 2013, they found many items indicating both drug use and the packaging of drugs for resale, as well as twenty-eight blue oxymorphone pills and thirty-eight white oxycodone pills [Doc. 20-14, p. 48–78, 82–88; Doc. 20-19, p. 17–25, 29, 32, 54, 55].

Tim Ford also testified that Petitioner provided him with one hundred "roxies" to sell on an unspecified date [Doc. 20-15, p. 33]. He further testified that while he had legitimately obtained pain pills from a pain clinic for some unspecified period of time, the clinic had discharged him about three months before the police raided his house because he did not have the proper number of pills in his prescription bottle [*Id.* at 71]. Tim Ford additionally testified that he personally used a number of the pills he received during the conspiracy, that he sold many of the pills he obtained during the conspiracy to pay for the heroin he also obtained through the conspiracy and personally used, and that he was receiving one-hundred oxycodone and one-hundred oxymorphone pills per week through the conspiracy at around the time of the raid on his house [*Id.* at 23–26, 35–36, 72].

Other evidence introduced at trial regarding the raid on the Ford house showed that Tim Ford and his wife, Allison, had prescription bottles on separate sides of their bed and in various other places in their home, that some oxycodone pills police recovered on July 31, 2013, came from a prescription bottle for Meloxicam with Tim Ford's name on it and others came from a prescription bottle for oxycodone with Allison Ford's name on it, and that the oxymorphone pills recovered from the Ford residence came from prescription pill bottles with Allison Ford's name on them, one of which was labelled as oxymorphone and one of which was labelled as oxycodone [Doc. 20-14, p. 54–55, 87; Doc. 20-19, p. 10, 16, 19, 20, 29, 31–32, 54, 55]. According to Officer Broome, Allison Ford had a prescription for oxymorphone, and police found other legitimate prescription bottles in the Ford residence [Doc. 20-14, p. 74].

Tim Ford testified that the "moons," that the police recovered from his house on July 31, 2013, were not his pills, even though police found some of them in a prescription bottle for oxymorphone with Allison Ford's name on them [Doc. 20-14, p. 87; Doc. 20-19, p. 55]. The record does not establish which other prescription pill bottles police found in the Ford residence were from legitimate prescriptions, and Officer Broome responded to Petitioner's counsel's question about whether that the pill count in the legitimate prescription pill bottles was "what the prescription said" by stating that it was "well below" [Doc. 20-14, p. 54–55, 87].

Based on all this evidence, a rational juror could have found that Petitioner constructively possessed the oxycodone and oxymorphone in the Ford residence on July 31, 2013. Tennessee law allows possession of controlled substances to be actual or constructive. *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013) (citing *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). Circumstantial evidence is sufficient to establish constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). To support a finding of constructive possession, the

evidence must demonstrate that an individual "had 'the power and intention at a given time to exercise dominion and control over . . . [the controlled substance] either directly or through others.'" *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)).

In simple terms, under Tennessee law, "constructive possession is the 'ability to reduce an object to actual possession.'" *State v. Porter*, 2005 WL 2333569, at *3 (quoting *State v. Cooper,* 736 S.W.2d 125, 129 (Tenn. Crim. App.1987)). But "[t]he mere presence of a person in an area where drugs are discovered is not, alone, sufficient" to establish constructive possession, nor is "mere association with a person who does in fact control the drugs or property where the drugs are discovered." *Cooper,* 736 S.W.2d at 129. This is not a case where Petitioner was merely present in an area where drugs were found, or merely associated with a person who controls the drugs and property where the drugs were found. To the contrary, as set forth above, the evidence established that Petitioner was the leader of a drug sale conspiracy for which Tim Ford sold drugs, including oxycodone and oxymorphone pills. The evidence further established that Tim Ford regularly took the pills he received through that conspiracy and that, on July 31, 2013, Petitioner visited Tim Ford's residence, received five to six thousand dollars from Tim Ford, and delivered oxymorphone to Tim Ford. When police later raided the Ford residence, they found oxymorphone and oxycodone. While police found some of the oxymorphone pills in a prescription bottle for which evidence at trial showed Allison Ford had a legitimate prescription, they found others in a prescription bottle for oxycodone with her name on it, and Tim Ford specifically testified that the "moons" that police found were not his. Also, while some oxycodone pills police found in the Ford residence were in a prescription bottle with Allison Ford's name on it, no evidence in the

record indicates that she had a valid prescription for oxycodone, and other oxycodone pills that police recovered came from a prescription bottle for Meloxicam with Tim Ford's name on it.

Thus, significant circumstantial evidence at trial suggested that when Petitioner visited Tim Ford's house on July 31, 2013, and received payment for drugs that Tim Ford sold for the conspiracy, the Ford residence contained oxycodone and oxymorphone pills that Tim Ford had received through the conspiracy for which Petitioner was the leader. As such, a rational juror could have inferred that Petitioner had the intent to exercise dominion and control over the unsold pills that Tim Ford had obtained through the conspiracy by collecting payment for other controlled substances Tim Ford had sold for the conspiracy during that visit, and that Petitioner had the ability to reduce at least some of the oxycodone and oxymorphone pills in that residence to his possession during that visit. Accordingly, the evidence was sufficient to support these convictions as well. Petitioner has failed to show that TCCA's decision in this regard was either contrary to or an unreasonable application of the *Jackson* standard.

## C.     Ineffective Assistance of Counsel

Petitioner brings several claims for ineffective assistance of counsel. The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant

makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of his counsel. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. To meet this prong, a petitioner must demonstrate that his counsel was so deficient that he no longer "function[ed] as the 'counsel' guaranteed under the Sixth Amendment." *Id.* at 687. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and, if either prong is not satisfied, the claim fails. *Id.* at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Petitioner asserts that the TCCA applied the incorrect standards to a number of his ineffective assistance of counsel claims. The Court will first address Petitioner's assertions regarding the TCCA applying the wrong standards before addressing the ineffective assistance of counsel claims.

34

1.      **Standards**

    a.      **Motions to Suppress**

Petitioner first asserts that the TCCA erred by requiring him to show that the motions to suppress that he alleges his counsel was ineffective for not pursuing would have been granted, and submits that it should have instead considered whether there is a reasonable probability that the jury's verdict would have been different if the evidence the motions to suppress sought to exclude was excluded [Doc. 2, p. 15, 21–22]. To support this argument, Petitioner cites *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986), for its statement that:

> [w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

[*Id.*]. Petitioner insists that this statement means that the TCCA should have considered whether the verdict in his case would have been different if the motions to suppress had been granted [*Id.*].

This argument has no merit. Even if *Kimmelman* sets forth the correct standard as Petitioner claims, it required Petitioner show that the motions to suppress were "meritorious." *Id.* As such, Petitioner cannot meet the *Kimmelman* standard upon which he relies or show prejudice under *Strickland* without showing that the trial court would have granted those motions, and the Court will not presume that the motions to suppress would have been granted and instead review whether there is a reasonable probably that the result of Petitioner's trial would have been different without the excludable evidence. *Id.*

    b.      **Clear and Convincing Evidence**

Petitioner also contends that the TCCA erroneously required him to prove by clear and convincing evidence that his counsel provided ineffective assistance, whereas federal law requires

only that a habeas petitioner establish "by a preponderance of the evidence" that his counsel was deficient [*See*, *e.g.*, *id.* (citing *Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 687))]. *Winbush*, at *11–17.

In response, Respondent contends that Petitioner misconstrues the TCCA's reliance on the clear and convincing standard that Tennessee courts apply to factual allegations in post-conviction proceedings and asserts that the TCCA reasonably applied *Strickland* to Petitioner's claims [Doc. 25 p. 38]. He further notes that the Sixth Circuit has found that reasonable jurists would not debate a district court's finding that a state court applied the correct standard to ineffective assistance of counsel claims where the court (1) expressly noted that the clear and convincing standard applied to the factual allegations of the petition; (2) correctly identified the *Strickland* requirements of deficient performance by counsel and prejudice to the petitioner; and (3) correctly noted that the prejudice prong required "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'" [*Id.* (citing *Churchwell v. Parris*, No. 20-5336, 2020 WL 5793542, at *3 (6th Cir. Aug. 12, 2020) (quoting *Churchwell v. State*, No. M2015-01567-CCA-R3-PC, 2016 WL 5253203, at *3 (Tenn. Crim. App. Sept. 21, 2016))].

In his reply, Petitioner contends that, in his case, the TCCA did not state that the clear and convincing standard applied only to factual allegations, and instead continuously applied that standard to his ineffective assistance of counsel claims [Doc. 28, p. 14 (citing *Bryant v. Westbrooks*, No. 3:15-0685, 2018 WL 4210784, at *13 (M.D. Tenn. Sept. 4, 2018) (providing that where the Tennessee Supreme Court stated that "a defendant seeking post-conviction relief 'must prove by clear and convincing evidence *the deprivation of a constitutional right*,'" and consistently referred to the defendant's failure to prove his counsel was deficient by clear and convincing

evidence, the state court had applied the incorrect standard in a manner that was contrary to federal law (quoting *Bryant v. State*, 460 S.W. 13 513, 521 (Tenn. 2015)].

The Court has reviewed *Churchwell* and *Bryant* and their underlying state court opinions and compared those opinions to the TCCA's opinion in this case and finds that where the TCCA denied Petitioner's ineffective assistance of counsel claims by finding that Petitioner had not established that counsel was deficient under the first prong of *Strickland*, it applied an incorrect "clear and convincing" standard to Petitioner's claim as a whole, but that it did not do so where it found that Petitioner had not shown prejudice under the second prong of *Strickland*. Specifically, in identifying the legal standard for Petitioner's ineffective assistance of counsel claims, the TCCA cited Tenn. Code Ann. § 40-30-110(f) and stated that it required Petitioner to "prove his [] allegations 'by clear and convincing evidence." *Winbush*, at *11 (citing Tenn. Code Ann. § 40-30-110(f)).

While the TCCA cited and relied upon Tenn. Code Ann. § 40-30-110(f), which provides that a petitioner has the burden to prove his "allegations of fact by clear and convincing evidence," the TCCA did not apply this standard to just the factual allegations. *See generally id.* And while the TCCA otherwise correctly laid out the *Strickland* standard and specifically noted that the prejudice prong of the *Strickland* standard required Petitioner to show a "reasonable probability" that the outcome of the trial would have been different to meet that requirement, it also repeatedly noted that Petitioner had not presented "clear and convincing evidence" that his counsel was deficient or "ineffective." *Id.* at *11–17.

But, in keeping with its citation of the *Strickland* "reasonably probability" requirement for the prejudice prong, the TCCA generally did not refer to "clear and convincing evidence" in its analysis of Petitioner's ineffective assistance of counsel claims where it found that Petitioner had

failed to show prejudice, or, if it did, it also referred to the "reasonable probability" standard in a manner that indicated that it applied the "clear and convincing" standard only to the factual allegations underlying those claims. *Id.* Thus, it appears that the TCCA properly applied the *Strickland* "reasonable probability" standard to Petitioner's ineffective assistance of counsel claims where it found that he failed to show prejudice resulting from the alleged ineffective assistance of counsel. But where the TCCA found that Petitioner failed to establish that his counsel was deficient, or "ineffective," it incorrectly required Petitioner to establish the underlying deficiency, and not just factual allegations, by clear and convincing evidence, rather than by a preponderance of the evidence, in a manner that was contrary to federal law.

Accordingly, the Court will now address Petitioner's ineffective assistance of counsel claims applying the *Strickland* standard de novo unless the TCCA clearly found that Petitioner failed to show prejudice. *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (providing that "[w]hen the state court issues a decision that is contrary to federal law, we review the merits of the petitioner's claim de novo").

### 2. Cell Phone and GPS Evidence

In his ineffective assistance of counsel claims labeled 1, 2, and 10, Petitioner claims that trial counsel was ineffective for not pursuing suppression of or objecting to cell phone evidence, (claim 1), and GPS data (claim 2), and all evidence resulting therefrom (claim 10) [Doc. 2, p. 15–27, 45–50]. While the TCCA arguably addressed at least part of these claims in different portions of its opinion in Petitioner's case, it did not squarely address the substance of the claims that Petitioner brought in his state court appeal and brings in his § 2254 petition. The essence of these claims is that his trial counsel provided ineffective assistance of counsel by failing to seek to suppression of or object to all evidence from certain cell phones, including GPS data from the

38

phone number ending in 9692, and all resulting evidence. In support of his claim, he cites both *United States v. Cronic*, 466 U.S. 648 (1984) and *Strickland*. Nevertheless, after examining the TCCA's opinion and independently and extensively reviewing the state court record in this case to determine the merits of these claims, the Court finds that Petitioner is not entitled to relief under § 2254 based on his arguments.

First, the TCCA analyzed Petitioner's claims challenging his trial counsel's failure to pursue the filed pretrial motions to suppress evidence as follows:

> When a defendant asserts that counsel rendered ineffective assistance of counsel by failing to call certain witnesses to testify, or by failing to interview certain witnesses, these witnesses should be called to testify at the hearing; otherwise, the defendant asks the Court to grant relief based upon mere speculation. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The same standard applies when a defendant argues that trial counsel was constitutionally ineffective by failing to file pre-trial motions to suppress evidence. *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App., Sept. 12, 2011), *no perm. app. filed*. In order to show prejudice, the defendant must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Id.*

> \*      \*      \*

> ### [] Motion to Suppress Evidence

> [Petitioner] argues that trial counsel was ineffective for failing to litigate the motion to suppress the evidence seized during [Petitioner]'s arrest. The State argues that [Petitioner] has not shown prejudice.

> Tennessee courts require motions to suppress evidence to be factually specific. "[T]he supporting claim for an evidentiary hearing on a motion to suppress must be sufficiently definite, specific, detailed and nonconjectural, to enable the [c]ourt to conclude a substantial claim was presented." *Davidson*, 606 S.W.3d at 297[] (quoting *Cohen v. United States*, 378 F.2d. 751 (9th Cir. 1967)). Specificity is required so that the court may be informed of whether Defendant has the right to a hearing. "[I]n order to receive a hearing upon such a motion, the motion must be sufficiently definite to enable the trial court to determine whether a substantial claim has been presented." *State v. Bell*, 832 S.W.2d 583, 588 (Tenn. Crim. App. 1991). Bare allegations of law without any factual allegations are insufficient. *See State v. Jefferson*, 938 S.W.2d 1, 9 (Tenn. Crim. App. 1996); *State*

39

*v. Howell*, 672 S.W.2d 442, 444 (Tenn. Crim. App. 1984). Adherence to the specificity requirement ensures judicial economy and fairness to all parties. "The reason for [the specificity requirement] is to prohibit the expenditure of court time in general exploratory probes to discover if there might be some possibility of a substantial claim." *Davidson*, 606 S.W.3d at 297

[Petitioner] argues that his June 28 and July 31 arrests were unlawful, thus any items seized during the arrests and any evidence discovered because of the arrests should have been suppressed. However, the motion speaks to one singular arrest. We do not know to which arrest the motion refers. Retained counsel testified that many of the motions he filed would need to be amended before they were heard. Further, the trial court gave permission to trial counsel to object to any evidence admitted during the trial. [Petitioner] has failed to show that, as written, the motion to suppress would have been granted. Therefore, [Petitioner] has not shown prejudice and is not entitled to relief.

### []*GPS Evidence and Pen Register, Trap, and Trace Information*

[Petitioner] argues that trial counsel was ineffective for failing to litigate the motion to suppress GPS evidence. The State argues that [Petitioner] has not been prejudiced.

The motion in question sought to "suppress this evidence [of] any information obtained without a search warrant including, but not limited to GPS information." The record shows that 15 to 20 cell phones were recovered during the investigation. No phone number is specified in the motion. Motions to suppress evidence must be factually specific. *See Davidson*, 606 S.W.3d at 297. Defendant has failed to show that, as written, the motion to suppress would have been granted. Therefore, Defendant has not shown prejudice.

*Winbush*, at *13–14.

To the extent that Petitioner challenges his counsel's failure to pursue the filed motions to suppress evidence prior to trial, he has not shown that the TCCA's denial of these claims was an unreasonable application of federal law or an unreasonable determination of facts in light of the evidence presented. As set forth above, while Petitioner insists that the TCCA applied the wrong standard to these claims by not determining whether there was a reasonable probability that the verdicts against him would have been different absent the excludable evidence under his reading of *Kimmelman*, the Court notes that *Kimmelman* requires the litigant to show that the motion to

40

suppress was "meritorious," and the TCCA clearly found that Petitioner's pretrial motions to suppress evidence, as written, were not.

In his § 2254 petition, Petitioner challenges his counsel's failure to move to suppress and/or object to the evidence derived from cell phone(s) Petitioner now claims were his, as well as GPS data from the cell phone with the number 9692, and all resulting evidence [*Id.* at 45–47]. The TCCA held as follows regarding Petitioner's claim that trial counsel was ineffective for failing to object to this evidence at trial:

> Defendant argues that trial counsel was ineffective for failing to object to all evidence that should have been suppressed, all evidence that should have been severed, all hearsay evidence, and all evidence of Defendant's prior bad acts. The State argues that trial counsel was not ineffective.
>
> The only exchange about objections at the motion for new trial hearing shows the following exchange between appellate counsel and trial counsel:
>
> > [Appellate counsel]: . . . did you ever object to any evidence coming in concerning the failure to appear counts? Evidence that came in to -- just to evidence coming in about these failure to appear counts during the trial?
> >
> > [Trial counsel]: I don't recall.
> >
> > .        .        .
> >
> > [Appellate counsel]: . . . did you ever object to any of the evidence coming in based on the stops, the arrests of [Defendant], June 28th, 2013 [and/or] July 31st, 2013? Did you object to the admissibility of any of that evidence based on a bad stop?
> >
> > [Trial counsel]: What evidence? Again, I don't recall what evidence came in based on the stop. The trash in the back of the vehicle?
> >
> > [Appellate counsel]: Like that, the photograph of the trash in the back of the vehicle?
> >
> > [Trial counsel]: I don't believe I did.
>
> Trial counsel did not recall if he made any objection to one question and stated he did not object to the second question. Defendant did not ask trial counsel any

41

questions as to why he did or did not make any objections. Defendant did [not] present any proof as to the myriad other objections he alleges trial counsel should have made. There is no obligation to object at every opportunity. *Donald Craig*, 1985 WL 3866, at *3. Defendant has not proven by clear and convincing evidence that trial counsel was ineffective.

*Winbush*, at *17. For reasons set forth above, the Court will address this argument de novo.

First, as the TCCA pointed out, Petitioner did not present any proof of why Petitioner's trial counsel did not object to the cell phone and/or GPS data at the hearing on the motion for new trial. Additionally, even if the Court could read the record to establish that Petitioner had a legitimate expectation of privacy in at least one of the cell phones that he claims police illegally searched and seized (other than the cell phone with the number 9692, which he expressly disclaimed, as addressed more fully below), Petitioner has not met his burden to show that there is a reasonable probability that the verdicts against him would have been different without the cell phone evidence that he asserts resulted from the cell phone searches/seizures [Doc. 2, p. 20–21, 47–48].[3] Substantial evidence of Petitioner's leadership role in the conspiracy and his guilt for the

---

[3] In his petition, Petitioner claims that this ineffective assistance of counsel claim based on his trial counsel's failure to object to illegally obtained cell phone evidence results in a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court provided that courts will presume prejudice under *Strickland* to a defendant where, among other specified circumstances, counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659–60. This is the *Cronic* provision upon which Petitioner relied in his state court appellate brief to support this argument [Doc. 20-29, p. 96, 98–99].

However, Petitioner does not allege that his trial counsel entirely failed to oppose the prosecution's case throughout trial but only that counsel failed to object to certain evidence introduced at trial [Doc. 2, p. 15–27, 45–50]. Thus, these claims are subject to the *Strickland* standard. *Cone v. Bell*, 535 U.S. 685, 697–98 (2002) (providing that where a petitioner did not allege that his trial counsel failed to oppose "the sentencing proceeding as a whole," but rather only failed to "adduce mitigating evidence" and waived closing argument, his claim was subject to the *Strickland* standard, rather than *Cronic*); *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002) (providing that where counsel reserved her right to make an opening statement, cross-examined several witnesses, and made a closing argument, claims challenging the effectiveness of her representation fell under *Strickland*, rather than *Cronic*).

42

crimes for which he was convicted came from his coconspirators' testimony about his leadership role in the conspiracy, and that evidence was corroborated by evidence police obtained through the raid on Tim Ford's house, their observance of Petitioner, the confidential informant, and his coconspirators, and the confidential informant's recorded controlled buys and interactions with Petitioner.

Moreover, while Petitioner asserts that his counsel's failure to seek to suppress and/or object to evidence that police obtained through GPS tracking of a cell phone and other evidence that resulted from the GPS tracking, including evidence obtained from the residence of Tim Ford and Tim Ford's testimony, the record shows that the GPS information came from the cell phone that had a phone number ending in 9692 [Doc. 20-6, p. 27–32]. But Petitioner disclaimed any ownership of that phone and recognized that doing so rendered his motion to suppress GPS evidence moot in his testimony under oath at the hearing on the motion for new trial [Doc. 20-24, p. 103; Doc. 20-25, p. 4]. And Petitioner has set forth no other proof that he had a legitimate expectation of privacy in data from that cell phone and therefore would not have had standing to contest the GPS data from that cell phone under the Fourth Amendment. *See United States v. Mathis*, 738 F.3d 719, 729 (6th Cir. 2013) (providing that, to have standing to contest a search, the defendant must demonstrate that "he had a legitimate expectation of privacy in the area searched or items seized").

Petitioner asserts that he has standing to contest the search and seizure of GPS data from the 9692 cell phone because the police application to gather such data indicated that he was the owner of that phone and the prosecution waived its ability to contest his standing by not raising that argument in response to his motions to suppress [Doc. 2, p. 55 n. 2]. However, the fact that an application to obtain GPS data completed by police named Petitioner as the owner of a phone

43

does not create a reasonable expectation of privacy in an item on the part of Petitioner, as required for him to have standing to challenge the seizure of data from that phone, especially in light of his disclaiming any interest in the phone. *Id.*

Further, the record establishes that the prosecution raised its challenge to Petitioner's standing to challenge the GPS data as soon as it knew that Petitioner disclaimed ownership of the 9692 cell phone from which the GPS data was taken, which was in the hearing on his motion for new trial. Nothing in the record prior to that point indicated that Petitioner disclaimed ownership of that cell phone. To the contrary, Petitioner's motions to suppress GPS data expressly requested to suppress only GPS data from Petitioner's cell phone [Doc. 20-1, p. 53, 97].

But most relevantly, Petitioner cannot now fault his counsel for not seeking to suppress GPS data from a cell phone over which he disclaimed any ownership interest. Specifically, Petitioner seeks to fault his counsel for not objecting to or moving to suppress GPS data from a cell phone, but Petitioner disclaimed ownership of that cell phone under oath, and thereby removed any standing he might have had to object to the admission of that evidence. Petitioner cannot have it both ways.

Accordingly, Petitioner has failed to show by the preponderance of the evidence that his counsel was deficient for not arguing for suppression of or objecting to this cell phone and GPS evidence or that there is a reasonable probability that the result of his trial would have been different if his counsel pursued suppression of or objected to such evidence, and he is not entitled to relief under § 2254 for these arguments.

### 3. Speedy Trial

Petitioner next argues that his counsel was deficient for not pursuing a motion to dismiss the charges against him based on a speedy trial violation[4] [Doc. 2, p. 33–38]. The TCCA stated as follows regarding this claim:

> [Petitioner] argues that trial counsel was ineffective by failing to file a motion to dismiss for violation of [Petitioner]'s right to a speedy trial. The State argues that [Petitioner] has failed to show that trial counsel was ineffective.
>
> At the hearing on the motion for new trial, trial counsel stated that he would not have made a motion to dismiss when the trial was scheduled to begin in a few days. Trial counsel further noted that some of the delay was caused by [Petitioner]'s failure to meet with his attorneys. The record shows that trial counsel considered the motion to dismiss and chose not to make the motion. We will not second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins*, 911 S.W.2d at 347; *Williams*, 599 S.W.2d at 279-80. [Petitioner] failed to prove by clear and convincing evidence that trial counsel was ineffective.

*Winbush*, at *16.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. "The speedy-trial right is "amorphous," "slippery," and "necessarily relative," so any claimed violation must be evaluated on an "ad hoc basis." *Miles v. Jordan*, 988 F.3d 916, 925 (6th Cir. 2021) (quoting *Barker v. Wingo*, 407 U.S. 514, 522, 530 (1972). The Supreme Court established four factors to evaluate when considering a speedy-trial claim: "(1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice to the defendant resulted." *Id.* "No one factor is dispositive. Rather, they are related factors that

---

[4] As Petitioner only alleged that his trial counsel was ineffective for not filing a motion to dismiss due to speedy trial in his appellate brief [Doc. 20-29, p. 91], the Court only addresses this argument.

45

must be considered together with any other relevant circumstances." *United States v. Sutton*, 862 F.3d 547, 559 (6th Cir. 2017).

The first factor focuses on the length of delay. "The Supreme Court has never clearly drawn that line, but has noted that '[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial'" once the delay "approaches one year." *Miles*, 988 F.3d at 925 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1, 658 (1992). In this case, the delay exceeded a year. Thus, further analysis of the *Barker* factors is necessary.

The second factor examines "whether the government or the criminal defendant is more to blame for th[e] delay." *Doggett*, 505 U.S. at 651. "Governmental delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government, while neutral reasons such as negligence are weighted less heavily, and valid reasons for a delay weigh in favor of the government." *Miles*, 988 F.3d at 925 (quoting *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006).

According to Petitioner, he was incarcerated for the charges against him in January 2014, and the trial was originally set for January 12, 2015, but the prosecution sought a continuance of the January 12, 2015, trial date to have more time to prepare for trial [Doc. 2, p. 35]. Because of this, the trial court lowered Petitioner's bond and placed him on GPS monitoring upon his release [Doc. 20-7, p. 11, 15–18]. Petitioner made that bond and therefore was released from his confinement [Doc. 20-8, p. 27].

Trial was then reset for March 31, 2015, and at a motion hearing on March 13, 2015, after there was discussion of moving that trial date, Petitioner's retained counsel noted that Petitioner had asserted his right to a speedy trial and stated that he would be ready to go to trial on March 31st. [*Id.* at 35–36]. Subsequently, on March 15, 2015, Petitioner's retained counsel filed

Petitioner's demand for a speedy trial [Doc. 20-1, p. 58]. However, the March 31, 2015, trial date was reset to August 31, 2015, at the request of the prosecution because a new prosecuting attorney was assigned to the case [*Id.* at 16, 18, 20]. Because of this, the trial court removed Petitioner's GPS monitoring bracelet [*Id.* at 28]. But on August 31, 2015, Petitioner's retained counsel sought to withdraw from his representation of Petitioner due to Petitioner's failure to cooperate with him, and the trial court granted that request and appointed Petitioner's trial counsel [Doc. 20-8, p. 39–41, 44–47]. At that point, the trial was set for less than six months later, on February 22, 2016 [*Id.*].

But again, the case did not go to trial on February 22, 2016, and while the record is unclear as to why, it establishes that when the next scheduled trial date arrived on Monday, August 8, 2016, Petitioner's trial counsel told the trial court that he did not ethically feel that he was able to go to trial because he had not met with Petitioner [Doc. 20-8, p. 47–48]. However, after Petitioner told the Court that he was ready to go to trial "today" and that he had gone through discovery "a thousand times" on August 8, 2016, Petitioner's trial counsel agreed to go to trial on that Wednesday, August 10, 2016, and the trial proceeded that day [*Id.* at 53–56; Doc. 20-9 p. 9].

In examining the different reasons Petitioner's case was continued, it appears that while the government certainly bears some of the responsibility for the delays, they do not rest solely on the government. And, the reasons the government asked for more time do not seem to be based on bad faith, harassment, or seeking a tactical advantage. Instead, on one occasion, the prosecuting attorney had just been assigned the case and needed more time to prepare. On one occasion, Petitioner's own retained counsel asked to withdraw because Petitioner had refused to cooperate with him in case preparation. At that point, the trial court reset the case to permit a new court appointed attorney to prepare. Petitioner also refused to cooperate with his new attorney.

47

The third factor addresses whether the defendant asserted his right to a speedy trial. In this case, Petitioner's counsel asserted Petitioner's right to a speedy trial in March 2015, fifteen months after Petitioner was arrested on the charges. The trial court set the case for trial five months later, but Petitioner's counsel withdrew on the eve of trial because Petitioner had not been cooperating with him. Thus, the case was continued in large measure based on Petitioner's conduct, not that of the government, after he had asserted his right to a speedy trial.

At the hearing on the motion for new trial, Petitioner testified that he did not agree to continue the February 22, 2016, trial date because he and his trial counsel had not spoken from the time of his appointment and that the lack of communication between him and trial counsel during this time was due to trial counsel [Doc. 20-24, p. 77–78]; *Winbush*, at *7–8. However, Petitioner's trial counsel testified that while he expected Petitioner to come to see him to prepare for trial, Petitioner did not do so, and this interfered with trial counsel's ability to prepare for trial [Doc. 20-25, p. 76–78]. While the case against Petitioner had been pending for a substantial amount of time when the trial court appointed Petitioner's new trial counsel, trial counsel needed at least some period of time after his appointment on August 31, 2015, to investigate the case, go through what Petitioner has acknowledged was "massive" discovery [Doc. 20-29, p. 18], and prepare for trial. Trial counsel also testified that he did not file a motion to dismiss the charges against Petitioner based on a speedy trial violation, did not recall Petitioner asking him to file such a motion on August 8, 2016, or otherwise, and that, even if he were aware that retained counsel had filed a demand for a speedy trial, he would not have pursued such a motion to dismiss because the case was set for and moving towards trial [*Id.* at 58–59].

Trial counsel additionally testified that he would have preferred a longer continuance on August 8, 2016, that he agreed to go to trial on August 10, 2016, due to Petitioner's insistence, and

48

that seeking a continuance while asserting a speedy trial violation is problematic [*Id.* at 51–52, 76–81]. Trial counsel also testified that he was unsure whether the February 22, 2016, trial date was reset due to agreement, or whether the case was "bumped" due to the trial court having another trial in progress [*Id.* at 81–83].

In ruling on the motion for new trial, the trial court stated that it believed that Petitioner perjured himself during his testimony at the hearing on that motion, *id.* at *10, and specifically credited the testimony from both Petitioner's retained counsel and his trial counsel that Petitioner was uncooperative in preparing his case for trial [Doc. 20-6, p. 57]. Though he asserted his right, he prevented his own counsel from preparing the case for the very trial Petitioner claimed he wanted.

The final factor is actual prejudice to the accused. "Prejudice 'should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect,' of which there are three: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Miles*, 988 F.3d at 925 (quoting *United States v. Ferreira*, 665 F.3d 701, 706 (6th Cir. 2011)). Petitioner was incarcerated until the trial was continued the first time in January 2015. At that point, because the government requested a continuance, the trial court lowered Petitioner's bond, which he made, and placed him on GPS monitoring. The trial was reset for March 31, 2015. When the government sought a continuance of that trial date, the trial court then removed the GPS monitoring bracelet. Thus, it appears that Petitioner has not faced oppressive pretrial incarceration. In his petition, he does not argue he faced anxiety and concern "beyond that which is inevitable in a criminal case." *Id.* at 928 (citation omitted). Instead, he claims that the delays caused his motions "to not be heard and denied him the ability to properly prepare a complete defense." [Doc. 2, p. 37]. His claim

49

here is meritless as there is no connection between the trial being continued and his counsel not seeking a hearing on the pending pretrial motions. A continuance of the trial did not foreclose his counsel seeking a hearing on the motions. In any event, the Court has already found that Petitioner has not shown the motions were meritorious.

Petitioner has also failed to show any actual prejudice as a result of the delays. He has not alleged any claim or witness lost due to the passage of time, any particular detriment to the preparation to his defense, or any other change in circumstances that might be construed as prejudice resulting from the delay in the case. *See Doggett v. United States*, 505 U.S. 647, 655, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) ("such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria…."). He claims that witness Bryant could not remember "certain things," but fails to show how he was prejudiced thereby [Doc. 2, p. 37]. He argues that he was prejudiced because Ford could not remember who had delivered oxymorphone to him on July 31, 2013. But Ford specifically claimed as well that Petitioner had delivered to him the oxymorphone prior to his equivocation. Petitioner has not identified any witnesses whose testimony was lost as a result of the delay. Petitioner does not show how the delay caused actual prejudice. *See United States v. Jackson*, 473 F.3d 660, 667–68 (6th Cir. 2007) (collecting cases and holding that a nearly two-year delay between a defendant's indictment and his arrest, attributable to the government's negligence, did not satisfy the actual prejudice factor of *Barker*); *see also Barker*, 407 U.S. at 533–34 (finding that "prejudice was minimal" despite delay "well over five years").

While the TCCA did not provide an analysis of the *Barker* factors in addressing Petitioner's speedy trial claim, that does not mean that it reached the wrong result. The Sixth Circuit noted in *Miles* that the fact that the state court did not "expressly weigh the two less serious forms of actual

50

prejudice … does not mean that it arrived at a conclusion oppositive of that reached by the Supreme Court on a question of law." 988 F.3d at 928. "Indeed, to receive AEDPA deference, a state court does not even have to 'explicitly address the factors outlined in *Barker*' at all, 'as long as the court does not apply a test or standard that is contrary to federal law.'" *Id.* (quoting *Brown v. Bobby*, 656 F.3d 325, 330 (6th Cir. 2011). Such is the case here. After a de novo review of this claim, the Court finds that Petitioner has failed to establish by a preponderance of the evidence that his trial counsel's failure to file a motion to dismiss based on a speedy trial violation was deficient. Nor has he shown that the TCCA's decision was contrary to, or an unreasonable application of, *Barker*'s four factors.

### 4. Prior Drug Conviction/Evidence of a Prior Bad Act

Petitioner next complains that his counsel was deficient for eliciting testimony from Investigator Jinks about his belief that Petitioner had a prior drug conviction [Doc. 2, p. 27–30]. The TCCA denied this claim on the grounds that Petitioner had failed to show his counsel was ineffective in this portion of the trial by clear and convincing evidence. *Winbush*, at *15. Accordingly, the Court reviews this claim de novo.

The relevant exchange at trial went as follows:

Q.      And prior to this, to your knowledge - - because I know you were in contact with the - - did [Petitioner] ever have any drug charges, period?
A.      Prior to this? He did have drug charges in another jurisdiction.
Q.      A conviction?
A.      Yes, I believe so.
         Mr. Slaughter: I was – that I'm aware of, there is none.
         Mr. Irvine: Judge, we're not allowed to go into those, so we haven't - - we haven't looked them up today. I mean, we're prohibited by rule from going there. So I can't answer that question for defense counsel right here.
         The Court: Okay.
Q.      You know for a fact he does?

51

A.   I believe he does.  I won't say that I know for a fact, but I believe
      that he had a prior from another jurisdiction

[Doc. 20-11, p. 24–25].  According to Petitioner, he had no such conviction [Doc. 2, p. 29].

Petitioner has not established by a preponderance of the evidence that trial counsel was deficient in this exchange.  Instead, it is apparent that, in asking Investigator Jinks this question, Petitioner's trial counsel was attempting to emphasize to the jury that Petitioner did not have any prior drug convictions but was surprised by Investigator Jinks providing an incorrect answer to his question.  The Court will not fault trial counsel for not foreseeing a witness's mistake.  Petitioner has also not shown this would have impacted the outcome of his case in light of the overwhelming evidence against him.  Petitioner is not entitled to § 2254 relief for this claim.

### 5.    Jury Instructions

Petitioner next claims that his counsel was ineffective for failing to request jury instructions for (1) the lesser included offense of facilitation and (2) Tennessee case law providing that testimony from a defendant's accomplices must be corroborated [Doc. 2, p. 30–33].  The TCCA rejected Petitioner's claim that trial counsel was ineffective for not asking for a facilitation jury instruction because Petitioner failed to present any proof with regard to that claim at the hearing, and therefore found that Petitioner had failed to prove that his counsel was ineffective by clear and convincing evidence.  *Winbush*, at *15.  The TCCA did not address Petitioner's assertion that counsel was ineffective for failing to request an instruction regarding corroboration of accomplice testimony.

Reviewing these claims de novo, the record establishes that Petitioner did not present any proof at the hearing on the motion for new trial regarding his trial counsel's failure to request both of these jury instructions.  Accordingly, the record does not establish why Petitioner's trial counsel did not request these jury instructions; Petitioner has failed to establish by a preponderance of the

52

evidence that this omission was due to deficient performance rather than any number other reasons; and he is not entitled to relief under § 2254 for these claims.

### 6. Commenting on Petitioner's Decision Not to Testify

Petitioner next claims that his trial counsel's statement to the jury that "Petitioner has chosen not to testify, so we have no proof at this point" amounted to ineffective assistance of counsel [Doc. 20-15, p. 90; Doc. 2, p. 38–39]. The TCCA found that Petitioner failed to show that any prejudice resulted from this statement, among other things. *Winbush*, at *17. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Criminal defendants have a right to remain silent and doing so cannot be used as substantive evidence of guilt. *Griffin v. California*, 380 U.S. 609, 615 (1965).

Even reviewing this claim de novo, the record supports the TCCA's finding that Petitioner failed to present any evidence to support his claim at the hearing on the motion for new trial. As such, Petitioner failed to establish a reasonable probability that the result of his trial would have been different without this statement. Moreover, what trial counsel said did not amount to an improper comment on Petitioner's exercise of his right not to testify. Instead, his isolated comment when considered in context of the trial was a reasonable assessment of the evidence presented at trial. In this case, he argued the state had introduced "no proof at this point." [Doc. 20-15, p. 90; Doc. 2, p. 38–39]. Just as a prosecutor may "summarize the evidence and comment on its quantitative and qualitative significance" during closing, *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003), so can Petitioner's counsel, and this, by itself, does not constitute ineffective assistance of counsel. Petitioner is not entitled to relief under § 2254 for this claim.

### 7. Failure to Investigate Favorable Witnesses

Petitioner also claims that his counsel was ineffective for failing to investigate two favorable witnesses, specifically August Allen and Christopher Holloway, who testified at the hearing on the motion for new trial that Petitioner was not a participant in any conspiracy with them [Doc. 2, p. 39–43]. The TCCA denied this claim, stating as follows:

> Defendant argues that trial counsel was ineffective for failing to discover an exculpatory statement made by a co-defendant and for failing to call Mr. Holloway, Mr. Green, and Mr. Allen as favorable witnesses during the trial. The State argues that Defendant is not entitled to relief.
>
> Defendant argues that Mr. Holloway was interviewed by the State a week before trial and that Mr. Holloway believed the prosecutor was taking notes during the meeting. Mr. Holloway and Mr. Allen testified at the hearing on the motion for new trial that Defendant was not present during the Ohio arrest. This same information was testified to during the trial by Officer Archer. Mr. Holloway and Mr. Allen also testified that Defendant had nothing to do with the drug conspiracy.
>
> Although Mr. Holloway and Mr. Allen both provided exculpatory evidence during the motion for new trial hearing, the trial court stated in its ruling; "[n]or does this [c]ourt find as credible the testimony of [Mr.] Allen and [Mr.] Holloway wherein each asserts that [Defendant] had no role in the conspiracy for which he was convicted." Mr. Green did not testify at the hearing. Trial counsel stated that he spoke with the attorney[]s for Mr. Holloway, Mr. Allen, and Mr. Green and understood that each of them would be cooperating with the State; therefore, he would not call them as favorable witnesses. The trial court accredited the testimony of trial counsel. We will not second-guess the trial court's credibility determination. *See Honeycutt*, 54 S.W.3d at 766-67. Defendant has not shown prejudice and is not entitled to relief.

*Winbush*, at *14.

Petitioner asserts that the TCCA's holding that Mr. Holloway and Mr. Allen's testimony lacked credibility and that he therefore had not shown prejudice improperly invaded the province of the jury by assessing the credibility of witnesses [*Id.*]. In support thereof, he cites *Barker v. Yukins*, 199 F.3d 867 (6th Cir. 1999) and *Sullivan v. Louisiana*, 508 U.S. 275 (1993). However, even if the Court accepts as true Petitioner's argument that the TCCA's holding on this claim

improperly invaded the province of the jury and therefore reviews it de novo, Petitioner is not entitled to relief, as he did not prove by a preponderance of the evidence that his counsel was ineffective for not interviewing Mr. Holloway and Mr. Allen prior to trial.

To determine if counsel was ineffective for failing to investigate, the Court must assess whether counsel's "investigation or lack thereof" was reasonable. *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). At the hearing on the motion for new trial, Mr. Slaughter testified that, prior to trial, he did not interview Petitioner's codefendants because attorneys represented them, but that he may have asked their attorneys if the codefendants were going to cooperate with the prosecution, and that it was his understanding that Petitioner's codefendants were cooperating with the prosecution [Doc. 20-25, p. 41–42]. He also testified that he did not recall Petitioner giving him the names of any favorable witnesses [*Id.* at 42], and nothing in Petitioner's testimony indicated that he ever gave his trial counsel any favorable witness names [Doc. 20-24, p. 52–103]. Moreover, testimony from Mr. Holloway and Mr. Allen confirmed that they pled guilty to conspiracy charges based on their roles in the drug conspiracy over which the evidence at trial established Petitioner was the leader [Doc. 20-23, p. 79–83; 95].

Accordingly, the record establishes Petitioner's counsel believed that Mr. Allen and Mr. Holloway were cooperating with the prosecution. As both Mr. Allen and Mr. Holloway pled guilty to charges of conspiring with Petitioner in the drug conspiracy, the record indicates that this belief was reasonable. And Petitioner presented no evidence that his counsel had any reason to believe otherwise.

Thus, Petitioner has not shown by a preponderance of the evidence that his counsel was deficient for not interviewing Mr. Holloway and Mr. Allen and he is not entitled to relief under §2254 for this claim.

### 8. Exculpatory Evidence

Petitioner next claims that his counsel's failure to discover notes from a police interview with Mr. Holloway was ineffective assistance of counsel [Doc. 2, p. 39–43]. The TCCA evaluated this claim with Petitioner's claim regarding trial counsel's failure to interview Mr. Holloway and Mr. Allen prior to trial, as set forth above. *Winbush*, at *14.

Even reviewing this claim de novo, the only proof Petitioner has presented of any notes from the police interview was Mr. Holloway's testimony that he was "pretty sure" that Hector Sanchez took notes during the interview [Doc. 20-23, p. 69–72]. But Petitioner presented no evidence his counsel should have known about any such notes, if they existed.

As such, Petitioner has not shown by a preponderance of the evidence that his counsel was deficient for not obtaining these notes from Mr. Holloway's police interview and he is not entitled to relief under § 2254 for this claim.

### D. Prosecutorial Misconduct

Petitioner also argues that the prosecution improperly failed to disclose the notes from Mr. Holloway's statement to police [*Id.* at 50–53].[5] The Due Process Clause of the Fourteenth Amendment requires that the state disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 97). "Even in the absence of a specific request, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* at 485 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

---

[5] As set forth above, Petitioner procedurally defaulted his other prosecutorial misconduct claims.

56

To establish a violation of *Brady*, a petitioner must show that the state withheld evidence that was material to his guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

A *Brady* violation has three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). However, no *Brady* violation exists if a defendant knew or had reason to know "'the essential facts permitting him to take advantage of any exculpatory information,'" or where the evidence was available to him from another source. *Abdur'Rahman v. Colson*, 649 F.3d 468, 474 (6th Cir. 2011), *cert. denied*, 133 S. Ct. 30 (2012) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991)).

Even if the Court assumes that Hector Sanchez took notes at Mr. Holloway's interview in which Mr. Holloway gave information exculpatory to Petitioner, Petitioner has not presented any evidence of the contents of any such notes. But regardless, the record establishes that Petitioner knew Mr. Holloway, and Petitioner has not presented any evidence that the information that would have been in any such notes was not available to him directly from Mr. Holloway. Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

**E.     Whether *Carpenter v. United States*, 138 S.Ct. 2206 (2018) applies to Petitioner's claim regarding evidence obtained from the cell phone and other GPS data.**

57

Petitioner next argues that the Supreme Court announced a new rule in *Carpenter v. United States*, 138 S. Ct. 2206 (2018) that police must have probable cause to obtain GPS and other cell phone data in order to comply with the Fourth Amendment, which he asserts applies to this case [Doc. 2, p. 55–58]. However, as the Court found above, Petitioner disclaimed any ownership interest in the 9692 cell phone from which police obtained GPS and other data he cites in this claim, and he has not set forth any other reason that he had a legitimate expectation of privacy in this cell phone's data such that police use of that data could have violated his rights under the Fourth Amendment. As previously discussed, he has not shown he had a legitimate expectation of privacy in that cell phone in as much as he disclaimed any interest in it. As such, these arguments have no merit and Petitioner is not entitled to relief under § 2254.

## F.   Cumulative Error

Petitioner next asserts that the cumulative errors in his trial that he identified above entitle him to relief under § 2254. However, "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)). Moreover, the Court has not found any constitutional errors in Petitioner's trial affecting his remaining convictions, and where "individual claims are all essentially meritless, [Petitioner] cannot show that the cumulative error[s] violated his constitutional rights." *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)).

Accordingly, Petitioner is not entitled to relief under § 2254 on this claim.

## IV.   CONCLUSION

For the reasons set forth above, Petitioner's motion to amend the petition [Doc. 6] is

**GRANTED** to the extent that the Court considered the merits of this motion above, the petition for habeas corpus relief [Doc. 2] is **DENIED**, the remaining motions [Docs. 7, 8, 14, 18, 29, 30, 32] are **DENIED as moot**, and this action will be **DISMISSED**.

## V.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (2000).

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right for his sufficiency of the evidence, ineffective assistance of counsel, prosecutorial misconduct, or cumulative error claims addressed on the merits above such that they would be adequate to deserve further review.  Moreover, jurists of reason would not disagree with the Court's finding that Petitioner procedurally defaulted the claims that he did not present to the TCCA.  Accordingly, a **COA SHALL NOT ISSUE.**  Also, the Court **CERTIFIES** that any appeal

from this action would not be taken in good faith and would be totally frivolous.  Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**

**ENTER:**

s/Clifton L. Corker
United States District Judge